794 F.2d 1359
 55 USLW 2137, 1986-1 Trade Cases 67,185
 RALPH C. WILSON INDUSTRIES, INC., Plaintiff-Appellant,
v.
CHRONICLE BROADCASTING CO.; Miami Valley Broadcasting
Corp.; Field Communications Corp.; Viacom International,
Inc.; P.I.T.S. Films; Twentieth Century-Fox Film Corp.;
Paramount Television Domestic Distribution, Inc.; Warner
Bros. Television Domestic Distribution, Inc.; MCA
Television Ltd.; Metro-Goldwyn-Mayer, Inc.; and United
Artists Television, Inc., Defendants- Appellees.
 No. 84-2758.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 9, 1985.
Decided July 16, 1986.
 
 Frederick P. Furth, Craig C. Corbitt, Furth, Fahrner, Bluemle & Mason, San Francisco, Cal., for plaintiff-appellant.
 Brent N. Rushforth, Dow, Lohnes & Albertson, Washington, D.C., M. Laurence Popofsky, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before SNEED, SCHROEDER and BRUNETTI, Circuit Judges.
 BRUNETTI, Circuit Judge:
 
 
 1
 Ralph C. Wilson Industries, Inc. ("Wilson") appeals the district court's grant of summary judgment in favor of appellees, various television stations and television program suppliers. We affirm.
 
 I.
 BACKGROUND
 
 2
 Wilson is the licensee of television station KICU-TV ("KICU"), Channel 36, licensed by the Federal Communications Commission ("FCC") to the city of San Jose, Santa Clara County, California. KICU is an independent station; it is not affiliated with a major network. It licenses its programs, except for locally-originated news, public affairs and sports, from various program suppliers.
 
 
 3
 Appellees are network and independent television stations ("station appellees"),[1] and suppliers of non-network television programs ("supplier appellees").[2] The station appellees negotiated from the supplier appellees exclusive rights to license programs, following a competitive bidding process among interested stations. "Thus, for example, a supplier would sell an exclusive license for M*A*S*H to [station appellee] KTVU, who [sic] would then be the only station in that area permitted to air M*A*S*H (or specified episodes of M*A*S*H) for the duration of the license." Ralph C. Wilson Indus. v. American Broadcasting, 598 F.Supp. 694, 700 (N.D.Cal.1984).
 
 
 4
 The exclusive licensing agreements vary in length and generally contain a right of first refusal for renewal. The station appellees enforce this exclusivity against all the television stations, in the San Francisco-Oakland-San Jose market, including KICU. Exclusivity is prevalent within the television broadcasting industry. The networks--ABC, CBS, and NBC--choose one local station affiliate within each recognized geographic television market. Each affiliate can present a unique program schedule. Similarly, suppliers of non-network programs license programs to a single station within each recognized geographic market.
 
 
 5
 The FCC establishes the geographic scope of exclusivity and permits exclusivity among television stations licensed to communities within 35 miles of each other or among stations licensed to communities within a designated hyphenated market. 47 C.F.R. Sec. 73.658(m) (1984). KICU and the station appellees are licensed to communities within the "San Francisco-Oakland-San Jose" hyphenated market. 47 C.F.R. Sec. 76.51(a)(7) (1984).
 
 
 6
 The geographic boundaries of an exclusive licensing area are in part determined by two national television rating services, A. C. Nielsen Co. ("Nielsen") and Arbitron Company ("Arbitron"). Nielsen and Arbitron categorize geographic areas into market groups based on actual viewership patterns. Both rating services include San Jose in the San Francisco geographic market.
 
 
 7
 Finally, the Independent Television News Association ("ITNA") was a cooperative association that provided non-exclusive news feeds to its members.
 
 
 8
 Wilson brought this action alleging violations of the Sherman Act, ("Act") 15 U.S.C. Secs. 1-7 (1985). On appeal, Wilson raises three claims under section 1 of the Act: 1) that the station appellees' exclusive program licensing practices unreasonably restrain trade; 2) that the station appellees engaged in a horizontal conspiracy to deny appellant access to quality television programming;[3] and 3) that station appellee KTVU and ITNA engaged in a conspiracy to deny appellant membership in ITNA. Appellant seeks declaratory and injunctive relief, and treble damages under section 4 of the Clayton Act, 15 U.S.C. Sec. 15 (1985).
 
 II.
 STANDARD OF REVIEW
 
 9
 We review the grant of summary judgment de novo. Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983). We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there exists any genuine issue of material fact and whether the substantive law was correctly applied. See First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1978); Amaro v. Continental Can Co., 724 F.2d 747, 749 (9th Cir.1984); Fed.R.Civ.P. 56(c). Although summary disposition is not favored in antitrust cases where motive and intent are at issue, Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), it is available in an appropriate case. Accord Landmark Development Corp. v. Chambers Corp., 752 F.2d 369, 372 (9th Cir.1985); Ron Tonkin Grand Turismo v. Fiat Distributors, 637 F.2d 1376, 1381 (9th Cir.), cert. denied, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).
 
 III.
 VIOLATION OF SECTION 1 OF THE SHERMAN ACT
 
 10
 A. The Exclusive Program Licensing Practices.
 
 
 11
 1. Legal Standards.
 
 
 12
 Wilson claims that the station appellees' exclusive licensing practices unreasonably restrain trade because the licenses are overbroad geographically, unreasonably long in duration, and incorporate unreasonable rights of first refusal.
 
 
 13
 Wilson does not contend that the general practice of exclusivity in television program licensing is illegal per se under the Sherman Act; in fact, KICU itself engages in exclusivity. Wilson's principal contention is that it receives lower ratings because it has been denied access to quality programming by the station appellees. Arbitron and Nielsen compile ratings books. The rating given to a television station determines the amount the station can charge advertisers. The higher the rating, the greater the share of the advertising market a station may receive, and, hence, the more profitable it may become. WIXT Television, Inc. v. Meredith Corp., 506 F.Supp. 1003, 1013 (N.D.N.Y.1980). Wilson argues that a "San Jose market" or "South Bay market" exists apart from the San Francisco market and consequently appellees should not be able to practice exclusivity against KICU.
 
 
 14
 In order to recover treble damages under section 4 of the Clayton Act, 15 U.S.C. Sec. 15, Wilson must show that it was injured in its business or property "by reason of anything forbidden in the antitrust laws." The antitrust laws include the Sherman Act, 15 U.S.C. Secs. 1-7. 15 U.S.C. Sec. 12(a) (1985).
 
 
 15
 Section 1 of the Sherman Act, 15 U.S.C. Sec. 1, prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."
 
 
 16
 Appellees' exclusivity practices are vertical, non-price restraints which are analyzed under the rule of reason standard. Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 58-59, 97 S.Ct. 2549, 2561-62, 53 L.Ed.2d 568 (1976). Although restraint may be the "essence" of every contract, Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), under the rule of reason standard only those agreements that unreasonably restrain trade violate the Sherman Act. National Soc. of Professional Engineers v. U.S., 435 U.S. 679, 687-88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1977). "Under this rule, the factfinder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T.V., Inc., 433 U.S. at 49, 97 S.Ct. at 2557.
 
 
 17
 Before we need determine whether the practices challenged by appellant are unreasonable restraints of trade, the appellant must show that station appellees' practices injured or decreased competition.
 
 
 18
 2. Injury to Competition.
 
 
 19
 The rule of reason standard "[f]ocuses directly on the challenged restraint's impact on competitive conditions." Professional Engineers, 435 U.S. at 688, 98 S.Ct. at 1363. It is not enough for Wilson merely to show that it was harmed in its capacity as a competitor. As the Supreme Court stated in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), "[p]laintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." The antitrust laws were enacted for "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (emphasis in original).
 
 
 20
 We have held that "it is injury to the market, not to individual firms, that is significant." Klamath-Lake Pharm. v. Klamath Med. Serv. Bureau, 701 F.2d 1276, 1292 (9th Cir.), cert. denied, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983); See also Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc., 710 F.2d 1366, 1373 (9th Cir.1983) (economic injury to a competitor does not equal injury to competition).
 
 
 21
 To determine whether competition has been harmed, the relevant market must be defined. Continental T.V., Inc., 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21; NCAA v. Board of Regents of the University of Oklahoma, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). The relevant market is determined by reference to both the product market and the geographic market. Brown Shoe, 370 U.S. at 324, 82 S.Ct. at 1523. It is undisputed that the relevant product market is quality television programming. The relevant geographic market, however, is disputed.
 
 
 22
 The district court found that the relevant geographic market is the San Francisco Bay Area and included San Jose in this market. Wilson contends that a separate San Jose market exists because of separate local advertising and programs acquisitions markets in that area. Wilson also argues that KICU's effective signal coverage is limited to the South Bay area and is substantially smaller and different than that of station appellees.
 
 
 23
 The relevant geographic market is not defined by the parties. Gough v. Rossmoor Corp., 585 F.2d 381 (9th Cir.1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). The commercial realities of the industry are the major factors in determining the relevant geographic market. Brown Shoe, 370 U.S. at 336-37, 82 S.Ct. at 1529-30.
 
 
 24
 Here, the commercial realities require us to define the relevant geographic market as the San Francisco Bay Area. We include San Jose in this market for several reasons. The two national television rating services, Nielsen and Arbitron, consider San Jose and San Francisco to be in the same market. In addition, the FCC regulates San Jose and San Francisco as part of the same market. 47 C.F.R. Sec. 76.51(a)(7) (1984). There is substantial overlap in the coverage of the signals of KICU and station appellees. KICU's transmitter is located in Alameda County, north of San Jose and toward San Francisco. Both its Grade A and B signals, which indicate the extent of coverage, encompass the San Francisco Bay Area. If KICU's signal is weaker than the signals of station appellees, as Wilson contends, it is attributable to the fact that KICU uses a UHF (ultra high frequency) signal which is generally weaker than a VHF (very high frequency) station's signal. KICU and the station appellees share a substantial overlap of viewers. KICU is licensed by the FCC to the city of San Jose, Santa Clara County. Arbitron ratings show that the station appellees and KICU have the following shares of the Santa Clara County television audience:
 
 1984 1982 1980
 
 25
 ---- ---- ----
 
 
 26
 KRON 16% 15% 18%
KTVU 11 12 13
KBHK 5 5 4
KICU 4 2 2
 
 
 27
 The station appellees enjoy a greater viewership currently than does KICU in its proposed San Jose market. Arbitron data also show that these four stations derive a similar percentage of their total viewing audience from Santa Clara County:
 
 1984 1982 1980
 
 28
 ---- ---- ----
 
 
 29
 KRON 22% 20% 20%
KTVU 16 17 17
KBHK 17 16 14
KICU 21 22 20
 
 
 30
 KICU's management has acknowledged that all the station appellees can be viewed in Wilson's proposed San Jose market. Finally, Arbitron ratings data show that approximately eighty percent of KICU's audience lies outside its proposed San Jose market.
 
 
 31
 Appellant has not shown any genuine issue of material fact with regard to actual injury to competition in the relevant market.
 
 
 32
 3. Foreclosure of the Market.
 
 
 33
 Wilson next argues that competition has been injured because the station appellees have foreclosed the quality television programming market. Appellant attempts to bring this claim under section 3 of the Clayton Act, 15 U.S.C. Sec. 14 (1973). That section, and the cases cited by appellant for support, concern tying arrangements and exclusive-dealing arrangements. Section 3 is, however, inapplicable to the type of injury alleged here.
 
 
 34
 Each station appellee obtains programs to the exclusion of the other station appellees, other stations within the San Francisco market, and KICU. Wilson does not allege that any one of the station appellees possesses market power. In fact, no station attracts a dominant share of the viewing audience. Nor has Wilson alleged the existence of a cartel of the station appellees.
 
 
 35
 A vertical agreement between an individual station and an individual supplier does not, without more, mean that the suppliers have engaged in the type of exclusive dealing covered under Section 3. Moreover, we have held that competition is not injured where a distributor seeks to obtain a product at the expense of any or all potential distributors. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir.1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).
 
 
 36
 Wilson has shown only that it is unwilling to pay the San Francisco Bay Area rate for television programming. It has not shown, for instance, that it is unable to bid for or obtain quality programs, that prices for these programs are illegally "fixed," that output is restricted, or that the program offerings are detrimentally affected. Some showing of this type is required to demonstrate harm to competition. Professional Engineers, 435 U.S. at 690, 98 S.Ct. at 1364.
 
 
 37
 Because Wilson has failed to raise any genuine issue of material fact regarding injury to competition, we need not address the remainder of its rule of reason claim.
 
 
 38
 B. Conspiracy to Deny Programming to Appellant.
 
 
 39
 Appellant's second claim is that the station appellees violated section 1 of the Sherman Act, 15 U.S.C. Sec. 1, by engaging in a conspiracy to deny and boycott programming to KICU. Under the antitrust laws an allegation of a horizontal conspiracy is analyzed under the per se rule.[4] United States v. Topco Associates, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).
 
 
 40
 Appellant must present evidence that tends to exclude the possibility that the station appellees were acting independently. See Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984). Appellant must show that the station appellees "had a conscious commitment to a common scheme designed to achieve an unlawful objective." Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3rd Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Finally, appellant "must come forward with specific factual support for its allegations." Program Engineering v. Triangle Publications, 634 F.2d 1188, 1195 (9th Cir.1980).
 
 
 41
 Appellant refers to the following as evidence of a conspiracy among the station appellees: (1) conscious, independent parallel conduct by station appellees; (2) the opportunity to conspire as a result of numerous social and business contacts; and (3) several telephone calls from station appellee KTVU to the other station appellees concerning exclusivity.
 
 
 42
 We have held that the mere existence of parallel conduct[5] is insufficient to establish a conspiracy. "[T]he evidence must be sufficient to infer an agreement among the defendants (whether express or implied) to take some concerted action." Id. All of the station appellees enforce exclusivity against KICU but "[l]ike businesses are generally conducted alike and, ... similarity in operations lacks probative significance unless present 'under circumstances which logically suggest joint agreement, as distinguished from individual action.' " Independent Ironworks, Inc. v. United States Steel Corp., 322 F.2d 656, 661 (9th Cir.1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963) (quoting Fox West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp., 264 F.2d 602, (9th Cir.1958)).
 
 
 43
 Appellant has not offered any evidence of a joint agreement. The allegation that station appellees' conduct is parallel is refuted by the different exclusivity clauses used in the program contracts with their suppliers. Moreover, the FCC permits the station appellees to utilize exclusivity vis-a-vis KICU. 47 C.F.R. Sec. 73.658(m) (1984). Thus, the station appellees need not conspire to achieve exclusivity--it is permitted.
 
 
 44
 That station appellees had an opportunity to conspire through social and business contacts is unsupported by the evidence. Appellant does not discuss the nature or existence of such contacts. Furthermore, such contacts alone, or even if combined with conscious parallelism, would be insufficient to establish a conspiracy. See Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir.1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Wilson cites Trist v. First Federal S & L Ass'n. of Chester, 466 F.Supp. 578, 587 (E.D.Pa.1979) for the proposition that a conspiracy may be inferred when there is evidence of direct social and business contacts combined with conscious parallelism. The Trist court found a conspiracy when membership in a trade association was coupled with a regular exchange of business information. Neither situation is present here.
 
 
 45
 The only evidence appellant offers in support of its claim of a horizontal conspiracy is a series of telephone calls made by the station manager, Tom Breen, of station appellee KTVU, to the other station appellees. Although Mr. Breen discussed exclusivity practices with the other station appellees during these calls, this evidence does not demonstrate the existence of a horizontal conspiracy. The calls were made on the advice of KTVU's counsel after the conspiracy allegedly began. Only after KICU threatened litigation concerning exclusivity did Mr. Breen make the telephone calls, and then only to determine whether or not the other stations practiced exclusivity. Appellant contends the call served as a policing mechanism to ensure that all the station appellees enforced exclusivity against KICU. Mr. Breen, however, had been unaware of the exclusivity practices of the other stations and did not disclose the practices of his own station.
 
 
 46
 Appellant has failed to allege any genuine issues of material fact concerning a conscious commitment to a common scheme to deny programming to KICU.
 
 
 47
 C. Conspiracy Between KTVU and the Independent Television News Association.
 
 
 48
 Appellant's final claim charges that station appellee KTVU conspired with ITNA to deny KICU membership in ITNA by first offering KICU a low membership rate and then subsequently a higher rate. ITNA's membership rates are predetermined at an equal rate for all stations within the same market based on Arbitron market data. San Jose is part of the San Francisco market and ITNA's board of directors determined that the San Francisco market rate should be offered to KICU. Although KTVU was a member of the board of directors of ITNA, all of ITNA's seven directors voted to offer KICU membership at the San Francisco rate. KICU does not offer any evidence of concerted action or improper motive on the part of KTVU or ITNA and, hence, no evidence of a conspiracy. That ITNA required KICU to subscribe at the membership rate for the San Francisco market, without more, does not support a claim of conspiracy. See United States v. Colgate & Co., 250 U.S. 300, 306-07, 39 S.Ct. 465, 467-68, 63 L.Ed. 992 (1919).
 
 IV.
 CONCLUSION
 
 49
 Viewing the evidence in the light most favorable to Wilson, we find that it has failed to show the existence of any genuine issues of material fact and that appellees were entitled to judgment as a matter of law.
 
 
 50
 AFFIRMED.
 
 
 51
 SNEED, Circuit Judge, concurring.
 
 
 52
 I concur in Judge Brunetti's opinion and write specially only to point out that Wilson's antitrust theory, if applied, would not materially increase the scope and range of choices available to viewers. That is, the elimination of the exclusivity feature would do little to increase the importance of consumer preference in setting price and output of quality television programming. See NCAA v. Board of Regents, 468 U.S. 85, 104-08, 104 S.Ct. 2948, ----, 82 L.Ed.2d 70 (1984).
 
 
 53
 This conclusion follows from the fact that consumers can exercise their power to view or not to view without regard to whether the program is shown by one station within the San Francisco-San Jose market area or by many such stations. This is certain so long as all such stations reach all viewers in the market area. A viewer not wishing "to buy," that is, to view, the program, can do so by selecting another station or turning off the set. One wishing "to buy" has only to turn on his set. Exclusivity does not interfere with this choice. In fact, it tends to increase the power of consumers because it forces other stations to offer competing programs, thus increasing the power of consumers to register preferences. The absence of exclusivity might result in a popular program being shown by several stations simultaneously, which would reduce consumer choice pro tanto. If a popular program were to be shown in different time slots, only a minor gain in consumer choice would be accomplished by making available time shifting without the use of a video cassette recorder.
 
 
 54
 Where some stations within the market area do not reach all viewers, the situation is somewhat different; however, even under these circumstances consumer preference is not impaired significantly. Exclusivity will tend to enable those stations having the capacity to cover the entire viewing area to bid the highest for popular programs. Consumers within the area will be able to view the programs. A station not reaching an audience of that size is not likely to be able to bid sufficiently high to obtain these programs. This is detrimental to that station but not to consumers--who either are unaffected because not within that station's range or, if within that range, are provided a choice of programs, one offered by the more powerful station, another by the weaker.
 
 
 55
 It comes to this. The station unable to reach the entire area would benefit from the abolition of exclusivity only if the pricing of the programs either was tied to the size of a station's potential audience (by means of a price-fixing arrangement unlikely to survive an antitrust attack) or was driven down by the absence of exclusivity to a level that the short-range station could afford. So long as at least one station can reach the entire area, that station very likely will be able to pay more for a popular program--even in the absence of exclusivity--than could the short-range station.
 
 
 56
 Appellant Wilson's problems may be those of the short-range station. If so, the antitrust law does not provide the needed remedy. The consumers in the relevant market area are not significantly deprived of the power to express their preferences and in that manner to control price and output of television programs.
 
 
 
 [1]
 Miami Valley Broadcasting Corp. (KTVU, Channel 2); Chronicle Broadcasting Co. (KRON, Channel 4); and Field Communications Corp. (KBHK, Channel 44)
 
 
 [2]
 Viacom International, Inc.; P.I.T.S. Films; Twentieth Century-Fox Film Corp.; Paramount Television Domestic Distribution, Inc.; Warner Bros. Television Distribution, Inc., MCA Television, Ltd.; Metro-Goldwyn-Mayer, Inc.; and United Artists Television, Inc
 
 
 [3]
 Quality television programming generally refers to programming with high viewer ratings
 
 
 [4]
 The per se rule is applied when "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)
 
 
 [5]
 Under the doctrine of "conscious parallelism" a finding of conspiracy under Section 1 may be shown if evidence that two or more firms have acted in the same way and are aware of each other's activities exists. KICU has not conclusively demonstrated this, nor has it shown any of the necessary "plus factors." See Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); C-O Two Fire Equipment Co. v. United States, 197 F.2d 489 (9th Cir.), cert. denied, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952); L. Sullivan, Antitrust at 317 (1977)