### 49ER CHEVROLET, INC., et al., Plaintiffs-Appellants,

v.

### GENERAL MOTORS CORPORATION, etc., et al., Defendants-Appellees.

### No. 85–5966.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 1986.

Decided Nov. 5, 1986.

---

Robert C. Fellmeth, Clark & Gumpel San Diego, Cal., for plaintiffs-appellants.

Girard E. Boudreau, Jr., Jones, Day, Reavis & Pogue Los Angeles, Cal., John G. Lyons, Vaughan, Paul & Lyons, Ann Fingarette Hass, San Francisco, Cal., for defendants-appellees.

Before TANG and BRUNETTI, Circuit Judges, and B. THOMPSON,* District Judge.

TANG, Circuit Judge:

Three former automobile dealers ("the dealers") appeal the district court's grant of summary judgment in favor of General Motors Corporation ("GM") and several other defendants. The dealers challenge: (1) GM's arrangements for paying dealers for repairing vehicles damaged in transit; and (2) GM's arrangements for compensating dealers for repairs performed under GM's warranty to retail customers. We affirm.

## BACKGROUND

This lawsuit was initiated by three former automobile dealers who had franchise agreements with GM. The dealers sued GM, Insured Transporters, Inc., Pacific Motor Transport, and E.F. MacDonald Company. The defendants were charged with: (1) engaging in horizontal and vertical price fixing, and illegal tying arrangements, in violation of the federal antitrust laws; (2) violating federal anti-racketeering laws; and (3) violating various state laws relating to unfair trade practices.

According to the undisputed facts, the automobile and truck divisions of GM enter into written agreements with individual persons or entities that sell and service motor vehicles. Each Dealer Agreement establishes an authorized dealer for a particular GM Division, sets the location from which the dealer will operate, identifies the dealer's individual owners and managers, and otherwise governs the relations of the parties. Under the Dealer Agreements, GM is obligated to deliver vehicles to the dealers in an undamaged and merchantable condition. GM contracts for delivery of the vehicles with various independent carriers including defendants Insured Transporters and Pacific Motor Transport.

Vehicles occasionally sustain damage while in possession of a carrier en route to a GM dealer. The Dealer Agreements provide that the dealers shall repair vehicles damaged in transit and shall submit to GM their claims for payment for repair work. Dealers may not make any claims directly against the carriers. GM explains the procedures for submission of damage claims in its Service Policies and Procedure Manuals. GM determines the amounts it pays dealers for labor, parts, and necessary accessories in accordance with the provisions of the applicable manual. GM prepares these manuals and changes or amends them from time to time, based on what GM believes to be pertinent business conditions. The dealers contend that GM's price schedules for in-transit damage sometimes require them to perform noncompensatory repair work.

The Dealer Agreements obligate dealers not only to repair vehicles damaged in transit, but also to perform repairs needed to satisfy GM's limited express warranties to its retail customers.[1] GM alone determines the extent of the warranty on its parts and vehicles. The Dealer Agreements provide that GM will pay the dealers for repairs arising from GM's warranties in accordance with the Service Policies and Procedures Manual. Dealers shall not impose any charge for such service on retail customers. GM bases the amount it pays for warranty repairs on such factors as the amount of labor required to perform the repair, the dealers' customer labor rate for non-warranty service, the dealers' cost for labor and parts, and an allowance for the dealers' overhead. In performing warranty repairs, GM dealers may use parts manufactured by others than GM; however, if non-GM parts are used, GM does not warrant such parts and dealers are required to explain this to their retail customers. The dealers contend that these procedures force them to accept compensation for work performed to fulfill the manufacturer's warranty at a lower price than they would

* Honorable Bruce R. Thompson, Senior United States District Judge for the District of Nevada, sitting by designation.

1. Dealers often offer their own independent and additional warranties or service contracts for which they alone are responsible. These are not at issue in this lawsuit.

normally charge in a competitive environment.

The original complaint in this action alleged five federal and state claims. After the complaint was amended, the district court granted the defendants' motion to dismiss the federal racketeering claim and denied their motion as to the remaining claims. After a stipulated program of limited discovery, oral argument, and supplementary briefing, the district court entered summary judgment for the defendants on all the remaining federal counts and dismissed the pendent state claims. The dealers timely appealed.

On appeal, the dealers have abandoned their racketeering claim and, relying on federal antitrust laws and California state laws, continue to challenge: (1) GM's system of payments to dealers for repairing vehicles damaged in transit, and (2) GM's system for compensating dealers for repairs performed under the manufacturer's warranty.

## DISCUSSION

### I

### *Standard Of Review*

This court reviews the grant of summary judgment de novo. *Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co.*, 794 F.2d 1359, 1362 (9th Cir.1986) (citing *Lojek v. Thomas*, 716 F.2d 675, 677 (9th Cir.1983)). Our role is to determine, viewing the evidence in the light most favorable to the non-moving party, whether there exists any genuine issue of material fact and whether the substantive law was correctly applied. *Id.; Golden Gate Acceptance Corp. v. General Motors Corp.*, 597 F.2d 676, 677–78 (9th Cir.1979); Fed.R. Civ.P. 56(c). Where there are no disputed facts, we must determine only whether the substantive law was correctly applied. *Amaro v. Continental Can Co.*, 724 F.2d 747, 749 (9th Cir.1984). Although summary disposition is disfavored in antitrust suits where motive and intent are at issue, *see Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), it is available in appropriate cases. *See Ralph C. Wilson Industries*, 794 F.2d at 1362; *Ron Tonkin Gran Turismo v. Fiat Distributors*, 637 F.2d 1376, 1381 (9th Cir.), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).

### II

### *Dealer Compensation For Transit Damage Repairs*

The dealers contend that the prices they received for making repairs to damaged vehicles were unlawfully fixed in two different ways: (1) *horizontally* between GM and the transit companies; and (2) *vertically* when these fixed prices were imposed on them. The dealers argue that these alleged agreements to fix prices were illegal per se under the Sherman Act, Section 1. We agree that the district court properly rejected these contentions.

#### A. *Horizontal Price-Fixing*

The Sherman Act, Section 1 proscribes "Every contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1. It is well established that a combination formed for the purposes of fixing prices is illegal per se under the Sherman Act. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 342–56, 102 S.Ct. 2466, 2472–79, 73 L.Ed.2d 48 (1982). However, the Supreme Court has deemed it of considerable importance that independent action by a single entity be distinguished from a concerted effort by more than one entity to fix prices or otherwise restrain trade. *Fisher v. City of Berkeley*, — U.S. ——, 106 S.Ct. 1045, 1049, 89 L.Ed.2d 206 (1986). The Court has stated: "Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement." *Id.; see also Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195, 1200 (7th Cir.1981) ("no liability can be predicated on Section 1 in the absence of some type of concerted action"), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637

F.2d 105, 110 (3d Cir.1980) ("Unilateral action, no matter what its motivation, cannot violate § 1."), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

The dealers contend that GM has combined with Insured Transporters and Pacific Motor Transport to set a low and artificial maximum price which will be paid to the dealers for transportation damage claims. This charge is unconvincing. To prevail, the dealers must prove that GM and the carriers had a conscious commitment to a common scheme designed to achieve an unlawful objective. *See Ralph C. Wilson Industries,* 794 F.2d at 1365 (citing *Edward J. Sweeney & Sons,* 637 F.2d at 111). Furthermore, the dealers must come forward with specific factual support for their allegations. *See id.* (citing *Program Engineering v. Triangle Publications,* 634 F.2d 1188, 1195 (9th Cir. 1980)).

The evidence presented to the district court simply does not support the dealers' contention that there was a horizontal price-fixing conspiracy between GM and the transportation companies. An expert for GM submitted to the district court the following sworn statement: "The carriers do not participate in any way or have any role whatsoever in establishing or determining General Motors' agreements and arrangements with its dealers." In addition, the stipulated facts support GM's contention that there is no conspiracy between it and any carrier to fix prices for transportation damage claims. Under the Dealer Agreements, the procedures for compensating dealers for repairs to damaged vehicles are set forth in the applicable Service Policies and Procedure Manuals and, according to the stipulated facts, "[t]hese manuals are prepared solely by General Motors."

The dealers' response is that the contractual arrangements between GM and the carriers for shipping vehicles to the dealers is sufficient proof, under liberal standards, to infer a conspiracy. This contention is unpersuasive. The antitrust laws are not offended by agreements as such, but only by those with an anticompetitive content. 6 P. Areeda, *Antitrust Law* ¶ 1400 at 4 (1986). Ordinary sales contracts do not unlawfully restrain trade; indeed, trade would be impossible without them. *See* 7 *id.* ¶ 1437 at 3. Doubtful "agreements" should not be so characterized for antitrust purposes unless the challenged conduct is of the kind the antitrust laws would have us scrutinize. 6 *id.* ¶ 1400 at 4; *see also Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 763, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984). The particular contract here between GM and its carriers, standing alone, falls short of establishing an unlawful "agreement;" we decline to infer an antitrust conspiracy merely on the basis of that contract.

"On a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement." *Monsanto Co.,* 465 U.S. at 763, 104 S.Ct. at 1470; *see also Program Engineering,* 634 F.2d at 1195. In this case there is no agreement among competitors to set prices. Because the dealers have failed to carry their burden, we conclude that the district court properly granted summary judgment for the defendants on the horizontal price-fixing claim.

B. *Vertical Price-Fixing*

The dealers contend that, after GM and the carriers horizontally conspired to fix the prices for repairing damaged vehicles, these prices were imposed on them. They argue that the imposition of such prices constituted *vertical* price-fixing which should be regarded as per se illegal. We find these contentions unpersuasive.

First, as already discussed, the dealers' argument that there was horizontal price-fixing in this case is meritless. Accordingly, this court, like the District of Columbia Circuit in *Proctor v. State Farm Mutual Automobile Insurance Co.,* 675 F.2d 308, 338 (D.C.Cir.), *cert. denied,* 450 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982), need not

decide whether the alleged vertical arrangements would be unlawful if they had been used to implement an unlawful horizontal agreement or conspiracy in restraint of trade.

In addition, the dealers' underlying argument that the alleged vertical price-fixing of repair prices constituted per se violations of the antitrust laws is unconvincing. In the first instance, the dealers' argument ignores the principle that allegations of vertical price-fixing are generally evaluated under the "rule of reason" rather than considered to be per se antitrust violations. *See Quality Auto Body,* 660 F.2d at 1202–03. In addition, it is a longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business. *Id.* at 1205 (citing *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). *Cf. Monsanto Co.,* 465 U.S. at 761, 104 S.Ct. at 1469 ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."). Applying these principles to the facts of this case, the district court properly concluded that GM's damage repair arrangements with its dealers did not constitute a vertical price-fixing arrangement in violation of the Sherman Act.

## III

### *Dealer Compensation For Warranty Repairs*

The GM dealers contend that the arrangement for compensating them for work done under the manufacturer's warranty was per se unlawful for two reasons: (1) it was an unlawful form of price fixing; and (2) it involved an illegal tying arrangement. Neither contention has merit.

#### A. *Price-Fixing*

The dealers argue that the existing system by which GM compensates dealers for warranty repairs is a per se unlawful form of vertical price-fixing. Specifically, the dealers complain that their rate of compensation is "fixed" by the terms of the Service Policies and Procedures Manuals. They challenge the lawfulness of these "fixed" prices based on certain cases holding that the setting of minimum and maximum resale prices by manufacturers or suppliers violates the Sherman Act, Section 1. *See, e.g., Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (publisher's establishment of maximum resale price of newspapers sold by carriers held per se violation of Section 1); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (distillers' agreement to fix maximum resale prices of their products sold by distributors held per se violation of Section 1).

The dealers' reliance on the resale price maintenance cases is misplaced. This is simply not a case involving the "resale" of any goods or services to retail customers. The stipulated facts clearly show that owners of new cars are not charged for warranty repairs. Because the dealer compensation arrangement challenged here does not involve any kind of resale, the cases relied on by the dealers are inapplicable.

The warranty repair compensation arrangements at issue here are best characterized as agreements between GM and its dealers to establish a price at which GM will buy warranty repair parts and services from its dealers. Because such arrangements are not manifestly anti-competitive, we do not believe that they constitute per se violations of the antitrust laws. *See Medical Arts Pharmacy v. Blue Cross & Blue Shield,* 675 F.2d 502, 504–06 (2d Cir. 1982) (pharmacy agreements, which establish the maximum price Blue Cross will pay participating pharmacies for prescription drugs, are not per se illegal). Accordingly, we conclude that the district court properly dismissed the dealers' antitrust claims based on alleged price-fixing of the rates at which GM compensated its dealers for repairs made under GM warranties.

B. *Tying Arrangements*

The dealers contend that GM's mandatory requirement that they do warranty work in order to keep their franchises is an illegal tying arrangement. Specifically, they argue that GM has unlawfully required dealers who wished to sell GM vehicles, the tying product, to perform warranty services compensated at precise amounts, the tied product.

We agree with the district court that the warranty payment arrangements at issue here fail to meet existing definitions of an unlawful tie-in. A tying arrangement has been defined as an agreement in which a seller will sell one product (the tying product) on the condition that the buyer purchase a second product (the tied product). *See Northern Pacific Railway v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958); *Digidyne Corp. v. Data General Corp.,* 734 F.2d 1336, 1338 (9th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). In this case, where the dealers perform repair services for GM and are paid by GM, they are not buyers of an allegedly tied product at all, but are sellers. Accordingly, the court was correct that the existing case law on tying does not apply.

The dealers, recognizing this difficulty, have argued for an extension of tying law to the circumstances of this case. We decline to do so. The issue is not one of mere semantics. The Supreme Court has indicated that the legality of any particular arrangement depends not on whether the challenged conduct can be labeled "tying," but rather on its competitive effects. *See Jefferson Parrish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1563, nn. 33 & 34, 80 L.Ed.2d 2 (1984). Because the dealers in this case failed to make an adequate showing of harmful anticompetitive effects resulting from the existing warranty payment arrangements, we conclude that the district court properly held that these arrangements do not violate the antitrust laws.

IV

*The Pendent State Claims*

The final issue on this appeal is whether the district court erred in dismissing the dealers' pendent state claims. Because the court dismissed all of the dealers' federal claims, it properly exercised its discretion in dismissing the pendent state claims as well. *See Litchfield v. Spielberg,* 736 F.2d 1352, 1358 (9th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985).

AFFIRMED.