**John D. TAGGART and Bettie F. Taggart, Plaintiffs,**

v.

**David S. RUTLEDGE; Janette G. Rutledge; David Rutledge Distributing Co., Inc.; Conoco, Inc.; and Continental Oil Company, Defendants.**

**No. CV 82-96-BU-CCL.**

United States District Court, D. Montana, Helena Division.

March 23, 1987.

Charles E. Petaja, Helena, Mont., Jerome J. Cate, Billings, Mont., for plaintiffs.

Gregory O. Morgan, Bozeman, Mont., Urban L. Roth, Poore, Roth & Robinson, P.C., Butte, Mont., and Jerry Ashby, Houston, Tex., for defendants.

## OPINION AND ORDER

LOVELL, District Judge.

This action arises out of Conoco, Inc.'s decision to sell as a "package" its properties in the area of Bozeman, Montana, and the subsequent sale to the plaintiffs of a single station within that package.

Plaintiffs (hereinafter also "Taggarts"), the owners and operators of the Four Corners Conoco station near Bozeman, filed suit in 1982 to recover damages from Conoco, Inc., and Continental Oil Company (hereinafter "Conoco"), and from Conoco jobber David S. Rutledge, for alleged federal antitrust violations as well as numerous alleged state law violations.

Federal subject matter jurisdiction is invoked pursuant to sections 1 and 4 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 4, and section 4 of the Clayton Act, 15 U.S.C. § 15. Venue is properly placed within the District of Montana pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c).

The matter is before the Court on all parties' cross motions for summary judgment.

### FACTS [1]

In 1970, plaintiffs John and Bettie Taggart left their home in Illinois and traveled to Montana with the intent of starting a new business. In October, the Taggarts became lessee dealers of a Conoco station known as the "East Main Travel Shoppe" in Bozeman, Montana. In addition to Conoco gasoline products, the Taggarts sold retail convenience store items such as food, refreshments, beer, cigarettes, and souvenirs.

Plaintiffs operated the East Main station until the Spring of 1977. On April 28, 1977, they executed a new Conoco Travel Shoppe Franchise Agreement and moved to the "Four Corners Conoco Travel Shoppe," located approximately seven miles west of Bozeman, at the intersection of the highways to Big Sky Ski Resort and Yellowstone National Park.

During this period of time, Conoco's operation was structured so that all Conoco stations in Montana were owned by Conoco (or leased from third parties) and leased to dealers upon execution of franchise agreements. The franchise agreements prohibited dealers from selling any gasoline as Conoco branded gasoline, except gasoline purchased from Conoco. Conoco gasoline was distributed to the dealers through Conoco "commission agents," who operated bulk plants owned or leased by Conoco. Commission agents derived their income by securing the business of customers (including retail stations, farmers, and various commercial accounts) and delivering Conoco products to those customers. Such agents were not salaried Conoco employees.

David Rutledge commenced employment with Conoco in 1968 in Billings, Montana. From October 1, 1976 until September 30,

---

1. The facts are drawn from the complaint, from Conoco's Statement of Material Facts, from plaintiffs' Statement of Material Facts, and from copies of the court file in Case No. 26818, in the District Court of the Eighteenth Judicial District of the State of Montana, in and for the County of Gallatin, of which the Court takes judicial notice. Fed.R.Evid. 201. Where disputed, the facts are construed in plaintiffs' favor. *See T.W. Electrical Service, Inc., et al. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630–31 (9th Cir.1987).

1977, Rutledge was a Conoco Sales Manager in Houston, Texas. In the summer of 1977, while vacationing in Montana, Rutledge learned that Conoco's Bozeman commission agent had his agency for sale. Following discussions with the agent, Rutledge agreed to purchase the commission agency for $30,000. Effective October 1, 1977, Rutledge terminated his employment with Conoco and became the Bozeman commission agent.

In January, 1978, the Bozeman area Conoco dealers were informed by letter that Conoco had decided to offer its Montana properties for sale in "packages." This represented implementation in Montana and the Rocky Mountain region of Conoco's MAAP program (Marketing At A Profit), under which Conoco had been selling its bulk plants and service stations throughout the United States since 1976. Initially, the MAAP program excluded the Northwestern Division, of which Montana was a part, except for certain properties in Nebraska and the Dakotas.

Implementation of MAAP in Montana took the Taggarts by surprise because Conoco employees had told them in the past that Conoco would never sell its Montana properties. The letter received by the Taggarts in January 1978, was a form letter used by Conoco to explain to its dealers what the MAAP program involved. Essentially, MAAP consisted of the sale to a single person or entity of all Conoco properties in a given area, including both service stations and bulk plants. The purchaser of the entire package would then become a "jobber" for Conoco, operating out of the bulk plant. Commission agencies were eliminated.

Each Conoco dealer ("incumbent") affected by the package sale was given an opportunity to bid on the package. Conoco personnel traveled to Bozeman in mid-January 1978, to explain the procedures to its area dealers. Several Conoco employees visited the Taggarts at their station to inform them of the MAAP process. Although the parties disagree as to the detail in which the process was explained to plaintiffs, it is undisputed that the Taggarts were told that Conoco's asking price for the Bozeman package was $598,000, plus estimated inventory and accounts receivable of $170,000, or a total of $768,000. All dealers were told that if they wanted additional information on the package they were to submit a signed form to Conoco, upon receipt of which Conoco would provide the information. The Taggarts were informed that the Bozeman package would be sold in its entirety to one person or entity, and that unwanted properties could not be deleted from the package.

The Taggarts, interested primarily in keeping their own station, discussed the package sale with other Bozeman Conoco dealers, including David and Janette Rutledge. Rutledge informed the other area dealers that he intended to bid on the package and, if successful, would sell individual stations to the other dealers. During this time, friction developed between the Taggarts and Rutledge. At one point, Rutledge informed the Taggarts that he would not sell or lease their station to them if he purchased the package.

Afraid of losing their station, the Taggarts considered bidding for the Bozeman properties. They discussed the package with Conoco personnel, and told at least one Conoco employee that they intended to bid one dollar over Conoco's asking price. The Taggarts were then advised to attempt to make a mutually agreeable arrangement with Rutledge. Rutledge received similar advice from Conoco.

On April 5, 1978, the Taggarts and Rutledges executed an Option to Purchase Agreement. Under the terms of this agreement, Rutledge offered to sell the Four Corners station to the Taggarts for $89,000 in consideration for the Taggarts' agreement to refrain from bidding on the package. The agreement was made conditional upon acceptance of Rutledge's bid by Conoco.

By letter dated April 14, 1978, Rutledge submitted a bid of $448,235 for the Bozeman package. Conoco rejected the bid as low, and informed Rutledge he could submit a higher bid. Rutledge was further instructed to delete his bid on a vacant lot owned by Conoco which was not part of the package.

Rutledge submitted a revised bid on April 29, 1979, in the amount of $508,000, plus a separate offer of $35,200 for the vacant lot. This bid was accepted. Before closing, Rutledge negotiated a reduction in the purchase price by $29,000, attributable to a potential claim against Rutledge and Conoco asserted by a former station lessee. The purchase price was thus reduced to $514,200. Shortly prior to closing, Rutledge learned that one of the station lessees who planned to purchase his station from Rutledge had been denied $40,000 financing. Without the $40,000, Rutledge would have been unable to proceed to close the deal with Conoco. Conoco thus agreed to retain title to the parcel represented by the $40,000 shortfall—a parking lot adjacent to the station—and had Rutledge execute a promissory note in that amount. Conoco subsequently sold the parking lot to a third party, and released Rutledge from the note.

The Taggarts did not submit a bid on the Bozeman package, nor were they aware (at the time) of the above-referenced changes negotiated by Rutledge.

On October 12, 1978, the Taggarts and Rutledges entered into a written agreement (hereinafter referred to as the Supply Agreement). Under the terms of this agreement, in consideration for the transfer of Rutledge's interest in the Four Corners station to the Taggarts, the Taggarts agree to purchase all gasoline sold from Four Corners exclusively from Rutledge. The Supply Agreement further provides that the gasoline will be purchased at the price charged by Rutledge to other stations in the area, with cash payment to be made within 24 hours of delivery and receipt of invoice. Rutledge agreeds to pay the Taggarts $10.00 monthly pump rental in addition to a rebate of one cent per gallon of gasoline the Taggarts purchase from Rutledge. The agreement carries a term of five years, and gives Rutledge the exclusive right to terminate it upon 30 days' notice and to renew it for additional periods of five years, not to exceed 15 years in aggregate.

Under the Supply Agreement, the Taggarts are given the right to purchase gasoline from other suppliers in the event that Rutledge is unable to meet their demand. The Taggarts are also entitled to a pro rata share of Rutledge's allocation of gasoline from Conoco, and allowed to terminate the agreement if Rutledge fails to provide such pro rata share. Finally, the Supply Agreement gives Rutledge a right of first refusal in the event the Taggarts desire to sell the property. The Supply Agreement, by its terms, was to be recorded in the office of the Gallatin County Clerk and Recorder.

Pursuant to the Option to Purchase and Supply Agreements, Rutledge sold the Four Corners station to the Taggarts for $89,000, and they continue to operate it at a profit. Rutledge continues to operate the Bozeman bulk plant through David Rutledge Distributing, and also operates at the retail level through his other Bozeman stations.

On October 2, 1980, David and Janette Rutledge instituted a civil action against the Taggarts in the District Court of the Eighteenth Judicial District of the State of Montana, in and for the County of Gallatin. The complaint alleged that the Taggarts had purchased gasoline from suppliers other than Rutledge, in breach of the Supply Agreement, and that the Taggarts had, on several occasions, failed to remit payment within twenty-four hours of delivery and receipt of invoice, as required by the Supply Agreement. The Taggarts filed an answer on December 22, 1980, setting forth a general denial, and on January 21, 1981, the action was dismissed with prejudice by stipulation of the parties, as fully settled upon the merits.

## LITIGATION BACKGROUND

This action was commenced October 4, 1982. The complaint alleges violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, and state law claims of fraudulent misrepresentation, actual fraud and undue influence, price-fixing in violation of the Montana Unfair Trade Practices and Consumer Protection Act, §§ 30–14–201, et seq., and impossibility of performance of the Supply Agreement. The complaint prays for treble damages under state and federal antitrust laws and actual damages

under the other state claims or, in the alternative, a declaratory judgment that the Supply Agreement is illegal and void as a matter of law.

Plaintiffs move for summary judgment as to liability only on Counts One through Four or for judgment declaring the subject agreement null and void. Plaintiffs claim the following antitrust violations:

1. Conoco's MAAP program violated section 1 of the Sherman Act, 15 U.S.C. § 1, because it concentrated many competitive dealers into one, thereby reducing competition. In support of this contention, plaintiffs assert that since only three major oil companies continue to do business in Bozeman, any attempt by Conoco to further concentrate the market must be viewed as monopolistic·in nature and given antitrust scrutiny. Additionally, plaintiffs assert that the package sale process violated section 1 because, although they were not prevented form bidding, the ultimate package sold to Rutledge was materially different from the package offered by Conoco. Plaintiffs maintain that Conoco maneuvered Rutledge into position to become the Bozeman area jobber, thereby precluding them from competing for the position.

2. The Supply Agreement violates section 3 of the Clayton Act, 15 U.S.C. § 14, as an unlawful requirements contract, because it forecloses a substantial amount of competition in the relevant market.

3. The Supply Agreement constitutes a price-fixing agreement, per se unlawful under section 1 of the Sherman Act, because the contract allows Rutledge to fix the minimum price at which the Taggarts can sell gasoline.

4. The Supply Agreement constitutes a contract in restraint of trade in violation of section 1 of the Sherman Act.

5. The defendants have unlawfully engaged in an attempt to monopolize the gasoline market in Bozeman, evidenced by a specific intent to control prices and to destroy competition in interstate commerce, in violation of section 2 of the Sherman Act. In support of this contention, plaintiffs claim that Rutledge has sold gasoline at retail at a price less than his wholesale price to the plaintiffs, which constitutes predatory pricing.

6. The Supply Agreement results in unlawful price discrimination in violation of section 2 of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13, in that: Rutledge gives the Taggarts a rebate of one cent per gallon and another retailer two cents per gallon; Rutledge requires plaintiffs to pay cash for their purchases, although credit is extended to others; and Rutledge sells gasoline to plaintiffs' competitors at a lower price than that he charges plaintiffs.

7. The Supply Agreement was unlawfully "tied in" to the sale of the Four Corners station, in violation of section 1 of the Sherman Act. Plaintiffs assert that Rutledge coerced them into accepting the Supply Agreement by threatening to refuse to sell them their station unless they accepted his terms.

Defendants each move for summary judgment on the ground that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

Rutledge raises the defense of res judicata, claiming that plaintiffs are barred from raising any claims which should have been brought in the prior state action. Rutledge further asserts that plaintiffs' price-fixing claims are specious because there is no agreement between any of the parties to fix resale prices, and that the Robinson-Patman Act claims must fail because the requisite interstate transaction is missing.

Conoco claims entitlement to summary judgment on the following grounds:

1. Conoco's actions in offering and selling the Bozeman properties as a package reflected unilateral decisions based on legitimate business reasons, and thus as a matter of law cannot have any antitrust implications.

2. Plaintiffs' price-fixing allegations must fail as a matter of law because no evidence has been produced tending to show any vertical or horizontal price-fixing.

3. Plaintiffs have offered no evidence of restraint of trade in any relevant market

by any defendant, and no evidence as to their actual damages, and therefore Conoco is entitled to judgment as a matter of law on the Sherman Act, section 1, claims.

4. Plaintiffs' claims under section 2 of the Sherman Act also must fail for the reasons that no evidence has been offered to show a conspiracy between the defendants to destroy competition or to control prices.

5. The exclusive supply contract between the Taggarts and Rutledges has no effect on competition and therefore, as a matter of law, violates no federal antitrust statute.

6. Because all sales and purchases of gasoline products between the Rutledges and Taggarts occurred within the state of Montana, the "transaction in commerce" requirement of the Robinson-Patman Act has not been met and there can be no price discrimination as a matter of law.

7. The four-year statute of limitations for bringing an antitrust action bars plaintiffs' claims under the federal antitrust laws.

## DISCUSSION

### I. Res Judicata

Defendant Rutledge asserts that plaintiffs' complaint is barred by the doctrine of res judicata on the ground that the claims against Rutledge brought in this action could have been raised in the 1980 state action brought by Rutledge to enforce the supply agreement.

Principles of res judicata have their origin in the full faith and credit clause of the United States Constitution.[2] Pursuant to the authority granted therein, Congress enacted the predecessor of 28 U.S.C. § 1738,[3] under which federal courts generally are required to give preclusive effect to prior state court judgments. *Mills v. Duryee*, 11 U.S. (7 Cranch) 481, 3 L.Ed. 411 (1813); *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

The Supreme Court has held that section 1738 requires federal courts to give preclusive effect to a state court judgment whenever the courts in the state from which the judgment emerged would do so. *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Res judicata concepts will not apply, however, when the party against whom the earlier decision is asserted did not have a full and fair opportunity to litigate the issue in question in the earlier case. *Id.* at 95, 101 S.Ct. at 415.

Plaintiffs maintain that they have not had a "full and fair opportunity" to litigate the issues raised herein, since the only issues in the state case were whether the Taggarts purchased gasoline from another dealer and the resulting damage to Rutledge, and the action was dismissed by stipulation of the parties.[4] Plaintiffs therefore argue that the legality of the contract was neither raised nor determined and that the resulting judgment cannot have any preclusive effect.

■ Res judicata principles embody two concepts. "Issue preclusion" refers to the preclusive effect of a judgment in foreclosing litigation of a matter that has been litigated and decided. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 376 n. 1, 105 S.Ct. 1327, 1329 n. 1, 84 L.Ed.2d 274, 278 n. 1 (1985). In contrast, "claim preclusion" refers to the preclusive effect of a judgment in foreclosing litigation of matters that should have been raised in an earlier suit. *Id.* Under section 1738, this Court must refer to the preclusion law of the State of Mon-

---

2. Article IV, Sec. 1, provides in pertinent part:
 Full faith and credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State.

3. 28 U.S.C. § 1738 provides in pertinent part:
 [The] Acts, records and judicial proceedings [of the legislature or any court of any State, Territory, or Possession of the United States] shall have the same full faith and credit in every court within the United States and its

Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

4. Plaintiffs claim that they never even filed a responsive pleading in the state action. The record indicates, however, that an answer was filed December 22, 1980, consisting of a general denial of the allegations contained in the complaint.

tana to determine the effect on this action of the prior state judgment. *Allen,* 449 U.S. at 96, 101 S.Ct. at 415; *Marrese,* 470 U.S. at 379, 105 S.Ct. at 1331, 84 L.Ed.2d at 281.

The Court in *Marrese* noted that "claim preclusion generally does not apply where '[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts....' " *Id.* at 382, 105 S.Ct. at 1333, 84 L.Ed.2d at 282 (citation omitted). The Court thus declined to adopt a reading of section 1738 that would allow a plaintiff to bring state law claims initially in state court only at the cost of foregoing subsequent federal antitrust claims. *Id.* at 385, 105 S.Ct. at 1335, 84 L.Ed.2d at 285.

Applying *Marrese* in conjunction with California preclusion law, the Ninth Circuit Court of Appeals held that a federal antitrust plaintiff was not precluded from bringing a federal action when the state court in a prior action had no jurisdiction to hear the federal claims. *Eichman v. Fotomat Corp.,* 759 F.2d 1434, 1436 (9th Cir. 1985). The court observed that California law requires jurisdictional competency for a judgment to have preclusive effect. *Id.* On this basis, the court concluded that plaintiff's federal antitrust claims could not be barred by res judicata, but that the pendent state claims based on conduct occurring prior to the date of judgment in the state action were precluded. *Id.* at 1438.

Montana appears to follow the rule of jurisdictional competency as well:

> The doctrine of res judicata states that a final judgment on the merits by a court of *competent jurisdiction* is conclusive as to causes of action or issues thereby, as to the parties and their privies, in all other actions in the same or any other judicial tribunal [of] *concurrent* jurisdiction.

*Wellman v. Wellman,* —— Mont. ——, ——, 668 P.2d 1060, 1061 (1983) (quoting *Meagher County Water Dist. v. Walter,* 169 Mont. 358, 361, 547 P.2d 850, 852 (1976)) (emphasis added). This language indicates the Montana Supreme Court's adherence to the principles expressed in *Marrese,* name-

ly, that a judgment will have no preclusive effect on claims outside the court's jurisdiction.

■ Therefore, applying Montana preclusion law within the framework of *Eichman* and *Marrese,* the Court concludes that plaintiffs' federal antitrust claims are not barred under the doctrine of res judicata by the judgment entered in state district court in 1981.

The remaining claims raised in the amended complaint are pendent claims based upon state law. Count Two alleges fraudulent misrepresentation against defendants Rutledge and Conoco, arising out of both the bidding process for the Bozeman package and earlier dealings between the parties. Count Three alleges fraud, collusion and undue influence against the defendants generally based upon the same course of dealing.

Under Count Four of the amended complaint, plaintiffs allege that Rutledge's practices under the supply agreement constitute price-fixing in violation of Montana law, and that his purpose in purchasing the Bozeman package was to fix the price of gasoline in the relevant market. Finally, in Count Five, plaintiffs allege that impossibility of performance and illegality of purpose render the supply agreement void.

The issue before the Court is whether any or all of these pendent state claims are barred under Montana preclusion law.

Montana historically has followed a four-pronged test for application of res judicata principles to a subsequent action: (1) the parties or their privies must be the same; (2) the subject matter of the action must be the same; (3) the issues must be the same, and relate to the same subject matter; and (4) the capacities of the persons must be the same in reference to the subject matter and to the issues between them. *Sullivan v. School District No. 1,* 100 Mont. 468, 472, 50 P.2d 252 (1935); *Brannon v. Lewis and Clark County,* 143 Mont. 200, 387 P.2d 706 (1963). Although the Montana Supreme Court recently has harkened back to this test as the standard for res judicata, *Fox v. 7L Bar Ranch Co.,* 198 Mont. 201, 645 P.2d 929 (1982), it appears to have done

so only in the context of issue preclusion. *Montana Power Co. v. Public Service Commission,* —— Mont. ——, 692 P.2d 432 (1984).

The Montana court has recognized the distinction between claim preclusion and issue preclusion, though not always articulating the precise definitions thereof. *See, e.g., Aetna Life and Cas. Ins. Co. v. Johnson,* —— Mont. ——, 673 P.2d 1277, 1280 (1984) ("Collateral estoppel involves preclusion of *issues* previously litigated and res judicata is preclusion of *claims* that have been litigated."). When directly confronted with the issue, however, the court clearly has followed the general rule governing claim preclusion. As early as 1935, the court recognized that a judgment is "binding and conclusive between all the parties to the suit and their privies and successors in interest, as to all matters adjudicated therein and as to all issues which could have been properly raised, irrespective of whether the particular matter was in fact litigated." *Kramer v. Deer Lodge Farms Co.,* 116 Mont. 152, 156, 151 P.2d 483, 484 (1935). Recently, the court stated: "It is well settled that a judgment or order is conclusive as to all matters which could have been litigated under the issues raised by the original pleadings." *Matter of Estate of Pegg,* —— Mont. ——, 680 P.2d 316, 320 (1984). *See also O'Neal, Booth & Wilkes, P.A. v. Andrews,* —— Mont. ——, 712 P.2d 1327, 1329 (1986) (" 'Once there has been full opportunity to present an issue for judicial decision in a given proceeding ... the determination of the court in that proceeding must be accorded finality as to all issues raised or which fairly could have been raised, else judgments might be attacked piecemeal and without end.' " (citation omitted.)).

Drawing from Montana case law, it seems evident that state law applies traditional principles of res judicata and collateral estoppel in determining whether a subsequent action is precluded.

The most important task in framing the vocabulary of res judicata is to distinguish clearly between two very different effects of judgments. The first is the effect of foreclosing any litigation of matters that never have been litigated, because of a determination that they should have been advanced in an earlier suit. The second is the effect of foreclosing relitigation of matters that have once been litigated and decided.

18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4402 at 42. Plaintiffs appear to recognize only the latter effect of the 1981 judgment by arguing that the contract's legality was neither raised nor determined. Under principles of claim preclusion, the Court' examination clearly must look further than to what was actually determined in the prior suit.

It is argued that the prior action has no preclusive effect because its dismissal was mutually requested by the parties without any matters having been litigated and decided. Thus, plaintiffs submit, they never had a full and fair opportunity to litigate the claims now presented. The Supreme Court of Montana, addressing the preclusive effects of a prior stipulation, has reached differing results. In *Smith v. Baxter,* 148 Mont. 291, 419 P.2d 752 (1966), the court gave preclusive effect to a stipulated dismissal upon subsequent administrative proceedings. It was there held that a prior stipulation with prejudice in compromise of litigation in state district court, as fully and finally settled on the merits, bars a subsequent adversarial administrative proceeding where the same parties, subject matter, and prayer for relief are involved in both matters. *Id.,* 419 P.2d at 754.

Following the same line of reasoning, the court held that dismissal of one defendant by stipulation was res judicata as to other defendants whose alleged liability was premised upon *respondeat superior.* *State ex rel. City of Havre v. District Court,* 187 Mont. 181, 609 P.2d 275, *cert. denied sub nom., Boucher v. City of Havre,* 449 U.S. 875, 101 S.Ct. 219, 66 L.Ed.2d 97 (1980). The court reasoned that "a stipulation of dismissal with prejudice of a defendant is tantamount to a judgment on the merits; and accordingly, such a dismissal with prejudice is res judicata as to every issue reasonably raised by the pleadings.... The Court will look at the dismissal with prejudice on its face, and will not

look behind the words 'with prejudice.'" *Id.,* 609 P.2d at 278.

A contrary result was reached in *Hughes v. Salo,* 203 Mont. 52, 659 P.2d 270 (1983), in which the court held that an action to enforce a foreign judgment was not res judicata as to a subsequent action on the merits of the underlying obligation. Distinguishing *City of Havre,* the court stated that where "neither the pleadings ..., nor the stipulations and accompanying dismissal with prejudice, made reference to or 'reasonably raised' any issue regarding the merits [of the subsequent litigation,]" res judicata concepts were not applicable. *Id.,* 659 P.2d at 274.

■ Defendant Rutledge's state court action against the Taggarts was, in essence, an action to enforce the contract between them. The stipulation for dismissal of that action was "tantamount to a judgment on the merits." *City of Havre,* 609 P.2d at 278. *See also Bloomer Shippers Assn. v. Illinois Central Gulf Railroad Co.,* 655 F.2d 772 (7th Cir.1981). Accordingly, the Taggarts cannot now be heard on issues reasonably raised or which could have been raised during that proceeding. The crux of the inquiry, then, is whether any or all of Taggarts' pendent state claims should have been raised in the prior action.

Under the Montana Rules of Civil Procedure, a defendant in a civil action is required to set forth as a counterclaim any existing claim against the plaintiff "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim...." Rule 13(a), Mont.R. Civ.P. The purpose of Rule 13(a) is "to bring all logically related claims into a single litigation, thereby avoiding a multiplicity of suits." *Julian v. Mattson,* — Mont. —, 710 P.2d 707, 709 (1985), (citing 20 Am.Jur.2d Counterclaim, Recoupment, Etc. § 15).

The Supreme Court of Montana has given strict interpretation to Rule 13(a), applying it to bar claims which should have been raised as compulsory counterclaims in a prior action. For example, in *O'Neal, Booth & Wilkes, P.A. v. Andrews, supra,* the plaintiff had sued the defendant in

Florida state court seeking payment of attorneys' fees. Judgment was entered in plaintiff's favor for the sum of $3,229.63. Subsequently, plaintiff initiated suit in Montana to recover the balance due from defendant. The defendant then asserted a counterclaim, alleging claims of breach of fiduciary duty, fraud, coercion and others. Affirming summary judgment in favor of the plaintiff, the Montana Supreme Court held that the counterclaim was barred by the doctrine of res judicata since it arose out of the same transaction that was at issue in the Florida litigation and should have been raised therein as a compulsory counterclaim. 712 P.2d at 1329.

A similar result was reached in *Robinson v. First Security Bank of Big Timber,* — Mont. —, 728 P.2d 428 (1986), in which a 1982 consent judgment was held to preclude the plaintiffs' subsequent complaint which should have been raised as a compulsory counterclaim to the prior suit. Observing that "a compromise agreement, when the basis for a final judgment, operates 'as a merger and bar[s] all pre-existing claims and causes of action,'" the court held that the dismissal of the first action concluded all pre-existing claims between the parties and that plaintiffs' claims in the second suit were thus barred by res judicata. *Id.,* 728 P.2d at 430 (quoting *Webb v. First National Bank of Hinsdale,* — Mont. —, 711 P.2d 1352, 1355 (1985)).

In order for Rule 13(a) to give preclusive effect to a prior judgment, the claims raised in the subsequent action must arise out of the same transaction or occurrence that formed the subject matter of the prior suit. *Julian v. Mattson,* 710 P.2d at 709. The court in *Julian* defined "transaction" in the following manner:

that combination of acts and events, circumstances and defaults, which viewed in one aspect, results in the plaintiff's right of action, and viewed in another aspect, results in the defendant's right of action ..., and it applies to any dealings of the parties resulting in wrong, without regard to whether the wrong be done by violence, neglect, or breach of contract.

*Id.* at 710 (quoting *Scott v. Waggoner*, 48 Mont. 536, 545, 139 P. 454, 456 (1914)).

Simply stated, the issue is whether the claims raised in the subsequent action are "logically related" to those raised in the first action by the opposing party. *See USM Corp. v. SPS Technologies, Inc.*, 102 F.R.D. 167, 170 (N.D.Ill.1984); *Springs v. First National Bank of Cut Bank*, 647 F.Supp. 1394 (D.Mont.1986).

■ Here, the Court concludes that the allegations raised in Counts IV and V of the Taggarts' complaint arose out of the same transaction as the Rutledges' 1980 state litigation and should have been raised therein as compulsory counterclaims under Rule 13(a). The "transaction" at issue in both cases was the execution of the October 1978 Supply Agreement between the Taggarts and Rutledges. The claims are "logically related" because Rutledge filed suit to enforce the provisions of the agreement, and Taggarts' claims in Counts IV and V of the complaint challenge the validity and enforceability of those provisions. Any claims plaintiffs had as to the legality of the contract or to the enforceability of certain provisions thereof were compulsory counterclaims within the meaning of Mont. R.Civ.P. 13(a) and are barred by res judicata from being raised in this action.

The allegations contained in Counts II and III of the complaint cannot be barred by principles of res judicata or under Rule 13(a). Counts II and III assert claims against Conoco, which was not a party to the state litigation, and broaden the relevant transaction considerably, to include events other than the negotiation and execution of the Supply Agreement. In contrast to Counts IV and V, the claims raised in Counts II and III do not go to the contract itself or to its application, but complain of actions occurring prior to the parties' execution of the agreement.

Therefore, Counts IV and V of the Taggarts' complaint will be dismissed as barred by the doctrine of claim preclusion.

## II. *Antitrust Issues*

The parties have cross motions for summary judgment as to each of the plaintiffs' federal antitrust claims. Under Fed.R.Civ.P. 56(c), summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. "A 'material' fact is one that is relevant to an element of claim or defense and [the] existence [of which] might affect the outcome of the suit." *T.W. Electrical Service Inc. v. Pacific Electrical Contractors Assn.*, 809 F.2d 626, 630 (9th Cir.1987).

■ The Supreme Court has indicated "that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles." *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The law of the Ninth Circuit, however, is that *Poller* "merely teaches caution" and does not preclude summary judgment in antitrust actions where appropriate. *Barry v. Blue Cross of California*, 805 F.2d 866, 871 (9th Cir.1986) (quoting *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir.1985)). Generally, summary judgment is appropriate in antitrust cases when there is no "significant probative evidence tending to support the complaint." *Robert's Waikiki U–Drive, Inc. v. Budget Rent-A-Car Systems, Inc.*, 732 F.2d 1403, 1406 (9th Cir. 1984).

The moving party has the initial burden of proving the absence of factual issues. However, once this burden is met, the opposing party must come forward with "sufficient probative evidence" tending to support his claim or defense. *See Richards v. Nelson Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987), and cases cited therein. In Sherman Act section 1 cases, "a moving defendant may meet its burden by proffering 'an entirely plausible and justifiable explanation of [its] conduct' that is 'consistent with proper business practices.'" *Barnes*, 759 F.2d at 680 (quoting *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 672 (9th Cir.1980)). The plaintiff must respond with "more than mere hearsay and legal conclusions." *Kaiser Cement Corp. v. Fishback & Moore, Inc.*, 793 F.2d 1100, 1104 (9th Cir.1986). In the absence of a

genuine issue of material fact, if the plaintiff " 'does not present a record sufficient to support a reasonable finding in his favor, a district court has a duty to grant the motion for summary judgment.' " *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464, 1467 (9th Cir.1986) (quoting *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1260 (9th Cir.), *cert. dismissed*, 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983)).

To prevail in their claims, the Taggarts "must establish a violation of the antitrust laws and an actual injury attributable to something the antitrust laws were designed to prevent." *Kaiser Cement*, 793 F.2d at 1104. Defendants' burden is to show that plaintiffs have raised no material factual issues which could be resolved by a trier of fact in plaintiffs' favor. Plaintiffs are entitled to have reasonable inferences drawn in their favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), but—once defendants have met their burden—cannot defeat summary judgment without presenting "specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

> Thus, the court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.

*T.W. Electrical Service*, 809 F.2d at 631 (citing *Anderson v. Liberty Lobby, Inc.*, — U.S. ——, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)).

With these considerations in mind, the Court turns to the substance of the parties' motions.

## A. Package Sale

Plaintiffs claim that the decision of Conoco to sell its Bozeman properties as a package violated section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, because the effect was to condense many competitive dealers into one, thereby reducing competition. Plaintiffs complain that only three major oil companies continue to do business in the Bozeman area and that the attempt by one to further concentrate the market must be viewed as monopolistic in nature and given antitrust scrutiny.

Plaintiffs further assert that the Bozeman package sale was the result of a conspiracy between Conoco and Rutledge to place Rutledge in a position to control the Bozeman gasoline market. They claim that Conoco manipulated the bidding process to guarantee Rutledge's success, and that Conoco thereafter ensured that Rutledge retained sufficient economic leverage over the local station operators to appreciably restrain competition in the supply and sale of gasoline by Conoco dealers in the area.

Conoco asserts that its decision was unilateral and made for legitimate business reasons and thus, as a matter of law, the package sale did not violate any antitrust laws.

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination ..., or conspiracy in restraint of trade or commerce...." 15 U.S.C. § 1. To establish a section 1 violation, an antitrust claimant must prove three elements: (1) an agreement or conspiracy, (2) resulting in an unreasonable restraint of trade, and (3) causing "antitrust injury." *Rickards v. Canine Eye Registration Foundation*, 783 F.2d 1329, 1332 (9th Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 180, 92 L.Ed.2d 115 (1986).

It is well established that independent action by a single manufacturer or seller of a product cannot give rise to a section 1 violation. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, so long as it does so independently." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775, *reh'g denied*, 466 U.S. 994, 104 S.Ct. 2378, 80 L.Ed.2d 850 (1984). *Accord Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1191 (9th Cir.1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985).

Numerous antitrust cases have arisen out of the termination of distributors or dealerships. Uniformly the courts refuse to find antitrust implications if the termi-

nation reflected the unilateral decision of the manufacturer. *See Sierra Wine and Liquor Co. v. Heublein, Inc.*, 626 F.2d 129, 133 (9th Cir.1980); *Sadler v. Rexair, Inc.*, 612 F.Supp. 491, 493 (D.Mont.1985) ("It is not an antitrust violation for a manufacturer to change distributors even if the affect [sic] is to seriously damage the former distributor's business."); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir.1969), *cert. denied sub. nom., Hawaiian Oke & Liquors, Ltd. v. Joseph E. Seagram & Sons, Inc.*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

Plaintiffs assert that the Bozeman sale was not merely a unilateral decision by Conoco to reduce the number of distributors. Rather, they assert, the sale was the product of a conspiracy between Conoco and Rutledge to reduce competition.

A similar argument was made in *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107 (5th Cir.1979). There, Service Oil Company, a long-time Texaco distributor in the Waco, Texas, area, decided to sell its assets and go out of the petroleum business. Plaintiff, interested in acquiring the distributorship, began negotiating with Service Oil. Any sale was subject to approval by Texaco, which retained a purchase option. Texaco determined that it should assign its purchase option to Poweram Oil, which already distributed Texaco products in the area. Poweram exercised the option and purchased the assets and properties of Service Oil. Plaintiff sued, alleging that Texaco and Poweram conspired to exclude it from the market to accomplish suppression of intrabrand competition and retail price maintenance.

The court ruled that the case involved nothing more than a wholly unilateral refusal to deal by a seller (Texaco) and the choice of one replacement dealer (Poweram) instead of another potential replacement dealer (Aladdin) based on legitimate reasons. *Id.* at 1112. Recognizing that the conduct of Texaco and Poweram had to be examined together to determine whether any antitrust violation occurred, the court stated that such joint conduct, without more, does not violate the antitrust laws. *Id.* at 1114 (citing *Joseph E. Seagram &*

*Sons*, 416 F.2d at 78). Thus, the court reasoned, Texaco's assignment of the purchase option to Poweram and simultaneous refusal to grant Aladdin a distributorship were unilateral decisions protected by the *Colgate* doctrine. *Id.* at 1115.

The court inquired further, however, examining Aladdin's contention that Texaco's refusal to deal produced an unreasonable restraint of trade because it was designed to lessen intrabrand competition. Finding no evidence to support this argument, the court rejected it as "inartful speculation." *Id.* at 1116. *See also Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637, 642 (D.N.J.1980) (" '[I]t is indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and that such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A.' " (quoting *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 (3d Cir.1972)).

Here, Conoco points to deposition testimony of its representatives in support of its argument that the package sale was a unilateral decision based on legitimate business objectives. Conoco's 1976 studies of its marketing practices concluded that its system was no longer profitable, and it developed the MAAP program in an effort to obtain a better return on its investments. In late 1977, Conoco determined it would extend the plan to its Rocky Mountain properties. Conoco states that package sales were utilized in order to "simplify the disposal of assets in a time frame that was manageable by selling them in clusters," and to design packages "that would be logistically or financially sound for a jobber to operate." (Conoco Statement of Fact No. 61.) Plaintiffs maintain that the package system was designed to broaden the range of prospective buyers and to secure sales to existing commission agents. (Plaintiffs' Statement of Facts at p. 5.)

The evidence shows that Conoco had legitimate business reasons for implementing the MAAP program. Plaintiffs do not dispute these reasons, nor have they present-

ed any evidence that MAAP was the product of anticompetitive motives or had anticompetitive effects.

> The unilateral decision of a single manufacturer to rearrange its distribution structure by limiting or increasing the number of its dealers or transferring its business to different dealers does not violate the Sherman Act.

*Seabord Supply Co. v. Congoleum Corporation, et al.,* 770 F.2d 367, 374 (3d Cir. 1985).

Plaintiffs argue, however, that even if the MAAP System itself has no antitrust consequences, its application to the Bozeman situation violated the Sherman Act because of the alleged conspiracy between Conoco and Rutledge to guarantee that Rutledge was the successful bidder. Plaintiffs assert that Rutledge was given information about the package that was not available to them, and that the package as sold was different than the package advertised. In essence, plaintiffs' complaint is that the bidding process was a sham and that Conoco never intended to allow any potential purchaser other than Rutledge to prevail.

The evidence before the Court shows that plaintiffs never actively negotiated with Conoco for purchase of the Bozeman package, and never even submitted a bid. Rutledge, on the other hand, eagerly pursued the purchase of the properties and made serious investigation before submitting his bid. His initial bid was rejected; however, since he was the only bidder, Conoco negotiated with him to reach an acceptable bargain. Plaintiffs have produced no "specific facts" from which a reasonable inference could be drawn that Conoco and Rutledge conspired to exclude them from the bidding process.

Moreover, plaintiffs have cited no support for their position that the bidding practices in which they speculate Conoco and Rutledge were engaged violated section 1 of the Sherman Act. At least one court has held to the contrary. In *Sitkin Smelting and Refining Co. v. FMC Corp.,* 575 F.2d 440 (3d Cir.), *cert. denied,* 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978), the court ruled that the plaintiff's allegations of sham bidding did not give rise to a Sherman Act antitrust action. There, the plaintiff and a third party had both bid on the defendant's properties. Plaintiff alleged that the other party was allowed to submit a higher bid after it learned of plaintiff's bid and that the higher bid was then accepted. The court characterized plaintiff's definition of sham bidding "in the sense that one bidder was preordained to obtain the contract if that bidder would match the high bid submitted." *Id.,* 575 F.2d at 445.

The court first rejected the idea that the mere existence of such "sham bidding" was per se violative of the Sherman Act. *Id.* at 447. It then went on to consider the practice under the "rule of reason" analysis—that is, whether its purpose and effect imposed an undue restraint on commerce. The court found that plaintiff had produced no evidence of any anticompetitive purpose or effect in the relevant market. *Id.* Absent such evidence, the court concluded, the bidding practice alone was insufficient to sustain an antitrust violation.

> All but one of the bidders were destined to come up "empty-handed" with or without the sham bidding. The agreement gave a preference to Krentzman. A manufacturer or trader, however, is free to choose the customers to whom it wishes to sell so long as its conduct has no market control or monopolistic purpose or effect. [Citations omitted.]

> Defendant's right to exercise this free choice is not limited because of the "sham" and the "sham" does not render the exercise of the choice a violation of the Sherman Act. Conduct not within the Act is not made into an antitrust violation by accompanying conduct which is reprehensible under some moral or ethical standard or even illegal under some other law.

*Id.*

 In this case, plaintiffs rely only on their suspicions and "feelings" to support their conclusion that an illegal conspiracy existed between Conoco and Rutledge with respect to the package sale. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. ... To survive a motion for

summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio,* — U.S. —, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1470). The only evidence in the record before the Court is that Conoco acted independently both in its decision to sell the Montana properties and in its decision to sell the Bozeman package to Rutledge.[5]

### B. Attempted Monopoly

Plaintiffs accuse Conoco and Rutledge of attempting to monopolize the Conoco operation in the Bozeman area, and assert that Conoco, by placing significant control of its Bozeman properties in the hands of Rutledge, has attempted to restrain competition in an already limited market. Most of the facts on which plaintiffs' attempted monopoly claims are grounded arise out of the same actions and events discussed in the preceding section. Here, however, plaintiffs assert a violation of section 2 of the Sherman Act, 15 U.S.C. § 2,[6] and the Court must proceed under a different analysis.

■ A successful claim of attempt to monopolize requires proof of three interrelated elements:

 (1) A specific intent to control prices or destroy competition in some part of commerce;

 (2) Predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and

 (3) A dangerous probability of success. *Airweld, Inc. v. Airco, Inc.,* 742 F.2d 1184, 1192 (9th Cir.1984) (quoting *Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1027 (9th Cir.1981)), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). Also recog-

nized as a fourth element of the test is proof of causal antitrust injury. *Marsann Co. v. Brammall, Inc.,* 788 F.2d 611, 613 (9th Cir.1986).

■ The interrelationship of these elements results from the ability to infer certain elements by establishing others. For example, if specific intent to monopolize cannot be proven directly, such intent may be inferred from anticompetitive conduct. *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 887 (9th Cir.1982), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). To obtain the benefit of such an inference, there must be proof of conduct falling into one of two categories, " 'either (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary.' " *Id.* (quoting *Wm. Inglis & Sons,* 668 F.2d at 1029 n. 11).

■ Similarly, a dangerous probability of success may be inferred either (1) from direct evidence of specific intent plus proof of conduct directed to accomplishing the unlawful design, or (2) from evidence of conduct alone, provided the conduct is also the sort from which specific intent can be inferred. *Wm. Inglis & Sons,* 668 F.2d at 1029. Thus, "conduct is the most critical element.... Predatory or anticompetitive conduct ... can support an inference of specific intent and dangerous probability of success." *Airweld,* 742 F.2d at 1192.

The question then becomes the extent to which plaintiffs must prove predatory or anticompetitive conduct; if the element of conduct is not satisfied, the court need look no further.

To satisfy the attempted monopoly test, the conduct of which the plaintiff complains "must be such that its anticipated benefits [are] dependent upon its tendency to discipline or eliminate competition and thereby enhance the [defendant's] long term ability to reap the benefits of monopo-

---

5. Indeed, the only evidence of a "conspiracy" is the agreement between Rutledge and Taggarts that Rutledge alone would submit a bid. See 16A J. Von Kalinowski, *Business Organizations* § 6A.02[3] at 6A–21 (discussing collusive bidding practices as unlawful price fixing under sections 1 and 3 of the Sherman Act).

6. Section 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations...."

ly power." *Wm. Inglis & Sons*, 668 F.2d at 1030.

A common method of establishing anticompetitive conduct to show attempted monopoly is proof that the defendants have engaged in predatory pricing. Plaintiffs assert that Rutledge practices predatory pricing by selling gasoline at retail prices lower than the wholesale prices he charges to plaintiffs. Plaintiffs state they are aware of two or three occasions on which this has happened.

▉ Pricing is considered predatory " 'only where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits.' " *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 739 (9th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1471, 89 L.Ed.2d 727, *reh'g denied*, —— U.S. ——, 106 S.Ct. 2002, 90 L.Ed.2d 681 (quoting *Wm. Inglis & Sons*, 668 F.2d at 1031). The Ninth Circuit generally approves of cost-based methods of determining when a price is predatory. *See Airweld*, 742 F.2d at 1193. Cost-based methods involve a determination of numerous costs of the seller who is accused of predatory pricing. These include fixed costs, variable costs, average costs, and marginal costs, and predatory pricing is generally established by proof that the prices charged by the defendant were below his marginal cost or average variable cost. *Id.* Without discussing the specific definitions and methods of proof, it suffices here to say that the plaintiff must show that the defendant is charging prices which are less than his costs, i.e., that he is losing profits. This then gives rise to an inference that the defendant is attempting to drive his competitors out of business by undercutting their prices, even though he foregoes short term profits; the end result is a monopoly in the relevant market. *See generally Wm. Inglis & Sons*, 668 F.2d at 1031–39.

▉ Plaintiffs have not even mentioned Rutledge's costs, must less determined his average variable costs or marginal costs. They have alleged only that on several occasions his wholesale prices have exceeded his retail prices. These allegations clearly are insufficient to support a claim of predatory pricing. The Ninth Circuit stated in *Zoslaw v. MCA Distributing Corp.*, 693 F.2d at 888, that the onus is upon the plaintiff to prove that the defendant " 'sacrificed greater profits or incurred greater losses than necessary in order to eliminate the plaintiff.' " The court further reasoned:

> In the absence of such a claim on the part of [the plaintiff], much less any evidence to that effect, [plaintiff's] predatory pricing claim is inadequate as a matter of law. Indeed, any other conclusion would support the perverse rationale that a defendant may not compete by lowering its prices "if competition would injure its competitors."

*Id.* [citations omitted].

▉ On at least one occasion, the Ninth Circuit has departed from its strict rule of comparing retail price and average variable cost, and remanded the case to permit the plaintiff "to attempt to show by means other than cost-price comparisons that the anticipated benefits of [the defendant's] price *depended on its tendency to eliminate competition.*' " *Marsann Co. v. Brammall, Inc.*, 788 F.2d at 615 (quoting *Wm. Inglis & Sons*, 668 F.2d at 1034) (emphasis in original). The ruling in that case, however, hinged on the difficulty of fixing the identity of the "product" for which to establish average variable costs, and on the fact that the alleged predatory price was offered only to a select customer. It appears from these authorities that Taggarts have not even reached the threshold issue necessary to an allegation of predatory pricing.[7]

---

7. Fed.R.Civ.P. 56(f) allows the Court to order a continuance to permit further discovery or submission of additional affidavits if the nonmoving party cannot present facts "essential to justify his opposition." Plaintiffs, however, have not suggested that they have had inadequate opportunity for discovery, and indeed, the discovery generated in this case is voluminous. Rule 56(f) will not assist a party where a full and fair opportunity for discovery has been provided, as here. *See Pfeil v. Rogers*, 757 F.2d 850 (7th Cir.1985); *Creusot-Loire International, Inc. v. Coppus Engineering Corp.*, 585 F.Supp. 45 (S.D. N.Y.1983).

The Ninth Circuit has held that "[i]n the absence of predatory conduct or per se violations, an antitrust defendant may still be found liable for attempted monopoly, but only if the antitrust plaintiff can establish a relevant market as a framework for evaluating behavior that does not rise to the level of a substantial restraint of trade." *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1214 (9th Cir.1983), *cert. denied*, 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166, *reh'g denied*, 471 U.S. 1220, 105 S.Ct. 2369, 86 L.Ed.2d 268 (1985). The Court has concluded that plaintiffs are unable as a matter of law to establish predatory pricing. Their other assertions of anticompetitive conduct focus on the reduction of competition in the retail gasoline sales market by consolidation of the Bozeman area Conoco dealers. As discussed *infra*, however, plaintiffs have produced no evidence whatsoever that the alleged anticompetitive conduct of the defendants has had, or threatens to have, a restrictive effect on competition in either the retail or wholesale gasoline sales market in the Bozeman area or in any other relevant geographical area.

Plaintiffs having come forward with no "specific facts" tending to show predatory or anticompetitive conduct, their allegations of attempted monopoly must fail as a matter of law.

### C. Price Discrimination

The Taggarts complain that Rutledge is engaging in illegal price discrimination in violation of section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a),[8] by use of discriminatory credit and rebate terms and by charging different wholesale prices to different retailers.

▮▮▮ Under the law of the Ninth Circuit, in order to establish jurisdiction under section 2(a) of the Robinson-Patman Act, a plaintiff must demonstrate:

(1) that the defendant is "engaged in interstate commerce;"

(2) that the price discrimination occurred "in the course of such commerce;" and

(3) that "either or any of the purchases involved in such discrimination are in commerce."

*Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 877 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). The Robinson-Patman Act's "in commerce" requirements are more stringent than the "affecting commerce" standards of section 1 of the Sherman Act. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194-95, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974). "The recognized purpose of the Robinson-Patman Act [is] to reach the operations of large interstate businesses in competition with small local concerns." *Standard Oil Co. v. Federal Trade Commission*, 340 U.S. 231, 238, 71 S.Ct. 240, 243, 95 L.Ed. 239 (1951). Thus, the reach of the Robinson-Patman Act "extends only to persons and activities that are themselves 'in commerce.'" *Gulf Oil*, 419 U.S. at 194, 95 S.Ct. at 398.

The Supreme Court has construed the "in commerce" requirement "to denote only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Gulf Oil*, 419 U.S. at 196, 95 S.Ct. 399. Therefore, unless Rutledge's alleged discriminatory sales occur in the course of interstate activities and at least one of such sales was made in interstate commerce, plaintiffs' claims must fail. *Id.*

Plaintiffs contend that the "in commerce" requirement is satisfied.

---

8. 15 U.S.C. § 13(a) provides in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ..., and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

The requirement of "commerce" appears to be met. The Defendants are clearly engaged "in commerce," acting in the cause [sic] of commerce, and the purchases by Plaintiffs of gasoline are "in commerce."

Plaintiffs' Opening Brief at 68. Plaintiffs argue that the gasoline in question is produced outside the state of Montana, that it is transported to Montana through an interstate pipeline, and that it is sold to many interstate travelers passing through Montana. Plaintiffs further cite one occasion on which Rutledge purchased gasoline directly from a Conoco jobber in the State of Idaho. Aside from that single purchase, which Rutledge admits, plaintiffs do not dispute the fact that Rutledge purchases his gasoline products from Conoco through a terminal in Montana, and sells exclusively to Montana gasoline retailers, generally within the Bozeman area. Plaintiffs have submitted no evidence of any sale by Rutledge outside Gallatin County, Montana.

The actions of Conoco, and its sales of gasoline to Rutledge, are not at issue under this claim because plaintiffs' price discrimination allegations are directed solely against Rutledge. Consequently, only the conduct of Rutledge may be considered in analyzing the Robinson-Patman allegations.

■ It cannot be disputed that although Rutledge purchases his Conoco products within Montana some originate outside the state and are transported across state lines for resale. The only issue is whether, at the time Rutledge sells such products to the Gallatin retailers, they are still within the "flow of commerce." The Ninth Circuit has recognized that "if goods from out of state are still within the 'practical, economic continuity' of the interstate transaction at the time of the interstate sale, the latter sale is considered 'in commerce' for purposes of the Robinson-Patman Act." *Zoslaw*, 693 F.2d at 877. The "flow of commerce" ends when the goods reach their intended destination. *Id.* at 878.

Reviewing principles for determining when a product has left the flow of commerce, the court in *Zoslaw* cited factors including whether goods coming from out of state respond to a particular customer's order or anticipated needs, or whether they are put in a storage facility for general inventory purposes, with no particular customer's needs in mind. *Id.* The court observed that problems arise with sales by out-of-state producers to distributors or retailers who resell the goods at the allegedly discriminatory price.

In such cases the analysis of intent is useful in determining whether the initial sale from the out of state producer bears sufficient relationship to the subsequent allegedly discriminatory sale to conclude that the latter sale is part of a continuous interstate transaction and hence in commerce.

*Id.* at 879. The court indicated that the analysis must consider the extent to which the subsidiaries act as independent distributors in their pricing and marketing decisions, "in effect, breaking the flow of commerce between the manufacturer and the local retailer." *Id.* at 880. This becomes a jury question if there is a legitimate question of material fact. *Id.*

Where goods are shipped interstate, and only "pass through" a warehouse on their way to a specific customer, the flow of commerce is not interrupted. *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568, 63 S.Ct. 332, 335, 87 L.Ed. 460 (1942). The Supreme Court held in *Walling* that the "ritual of placing goods in a warehouse ... [which] interrupts but does not necessarily terminate their interstate journey," does not stop the flow of commerce if such goods are destined for a particular customer. *Id.* The Court concluded that "if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points." *Id.* The flow of commerce ends, however, if the distributor is sufficiently independent of the interstate manufacturer. *Zoslaw*, 693 F.2d at 880.

Construing the second jurisdictional requirement of the Robinson-Patman Act, the price discrimination does not occur "in the course of" interstate commerce unless interstate transactions are involved in the alleged violation. 16C J. Von Kalinowski,

Business Organizations ¶ 26.02[2]. "Essentially, the second element removes from the reach of the statute the activities of an intrastate seller who purchases goods in interstate commerce." *Id.* at 26–15 to –16.

The undisputed facts show that Rutledge is an independent Conoco jobber who purchases gasoline from a Conoco terminal in Bozeman and resells it to area retailers at a price he establishes himself. Plaintiffs claim that Rutledge is merely an agent of Conoco, but have presented no facts in support of this claim. The Jobber Franchise Agreement entered into between Conoco and Rutledge expressly provides that the jobber is an "independent businessman;" it does not constitute an exclusive supply agreement. Plaintiffs do not dispute that Rutledge exercises exclusive control over his business practices, owns his own equipment, hires and fires his own employees, and directs the operations of his business. Under the franchise agreement, the jobber is obligated to "conduct its business operations according to standards which will promote the continuing good reputation of Continental and other Continental Jobbers...." Plaintiffs argue that Conoco has the right to terminate Rutledge's franchise agreement if it disapproves of his practices. They offer no evidence, however, to support their claims that Conoco has any control over Rutledge's operations.

■ Viewing these facts within the framework established in *Zoslaw*, it is clear that Rutledge comes within the definition of "independent distributor" contemplated by the court, "breaking the flow of commerce between the manufacturer and the local retailer." *Id.*, 693 F.2d at 880.[9] To rule otherwise would fly in the face of the established purpose of the Robinson-Patman Act, since Rutledge is exclusively an intrastate seller and all of the alleged discriminatory pricing practices occurred with intrastate sales. The facts alleged here simply are not within the contemplated application of section 2(a), which requires that "at least one of the two transactions which,

when compared, generate a discrimination must cross a state line." *Gulf Oil, supra,* 419 U.S. at 200, 95 S.Ct. at 401.

## D. Price Fixing

Plaintiffs claim that the exclusive supply agreement allows Rutledge to fix the retail price of gasoline in violation of section 1 of the Sherman Act. Plaintiffs agree that the contract does not set a minimum price at which they must sell gasoline; they assert, however, that Rutledge controls that price by raising or lowering the wholesale price. Because plaintiffs are compelled to purchase from Rutledge and cannot buy at a lower price from another distributor, they assert that the supply agreement constitutes an illegal vertical price fixing arrangement.

The United States Supreme Court has long held that "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Ninth Circuit has recognized four categories of restraints to be per se unreasonable under this rule: horizontal and vertical price-fixing; horizontal market division; group boycotts or concerted refusals to deal; and tie-in sales. *Gough v. Rossmoor Corp.,* 585 F.2d 381, 386 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). Recently, however, the Circuit Court indicated that allegations of vertical price-fixing generally should be evaluated under the "rule of reason" rather than considered to be per se antitrust violations. *49er Chevrolet v. General Motors Corporation,* 803 F.2d 1463, 1468 (9th Cir.1986).

■ Normally, before the per se rule will be applied, there must be sufficient

---

**9.** Although the court in *Zoslaw* indicated that this "threshold" issue would normally be a jury question, summary judgment is appropriate where plaintiffs have not presented an adequate

record to support a finding in their favor. *Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1477 (9th Cir.1986), *reh'g denied,* 810 F.2d 1517 (9th Cir.1987).

evidence to establish a combination or conspiracy under section 1. *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1261 (9th Cir.1983), *cert. dismissed*, 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983). The requirement of a conspiracy will be satisfied, however, if the plaintiff can prove that the defendant coerced him into adhering to a price schedule and that the plaintiff acquiesced therein. *Id.* at 1266 (citing *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968)).

 In this case, because of the position of Rutledge as both a retailer and distributor, plaintiffs have alleged both horizontal and vertical price-fixing. Horizontal price-fixing occurs when two or more competitors make an arrangement that interferes with the setting of prices by free market forces. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Vertical price-fixing is an agreement to fix resale prices to third parties. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960). Plaintiffs contend that Rutledge has engaged in horizontal price-fixing in his capacity as their competitor and in vertical price-fixing in his capacity as their supplier.

 Before the per se doctrine can be invoked under a theory of vertical price fixing, evidence of resale price maintenance must be present. *Westinghouse Electric Corp. v. CX Processing Laboratories, Inc.*, 523 F.2d 668, 673 (9th Cir.1975). There can be no violation of section 1 where there is no evidence of any attempt by the antitrust defendant to dictate resale prices to its distributor nor evidence that the defendant intended to fix prices. *Id.*

In order for plaintiffs to succeed on their claims of vertical price-fixing, they must establish (1) that Rutledge pressured them into maintaining prices at a certain level, and (2) that this coercion actually impinged upon their freedom to set resale prices. *Filco*, 709 F.2d at 1266. The Court takes as true plaintiffs' allegations that they were coerced into signing the supply agreement for fear of losing their station. This, however, does not establish the first element of the test, that they have been coerced into setting a certain retail price

for their gasoline. Indeed, they have admitted that Rutledge does not dictate their prices. There is no evidence that he even suggests retail prices to them.

Under the law of this circuit, actions of suppliers to influence resale prices are not illegal "unless they sufficiently induce avoidance of price competition." *General Cinema Corp. v. Buena Vista Distribution*, 681 F.2d 594, 597 (9th Cir.1982). Thus, claims of vertical price-fixing have been rejected where resale prices are not dictated. *Id.; Westinghouse Electric*, 523 F.2d at 675–76; *49er Chevrolet*, 803 F.2d at 1468.

Courts also have refused to find vertical price-fixing where only wholesale prices are fixed by the supplier. For example, in *Butera v. Sun Oil Co., Inc.*, 496 F.2d 434 (1st Cir.1974), *cited with approval in Filco*, the court rejected the plaintiff/retailer's price-fixing claims arising out of Sun Oil's wholesale price maintenance system, concluding:

[A] producer's tight control over its wholesale prices does not become resale price maintenance merely because retail outlets to which it sells, being highly competitive and selling at low margins, are sensitive to every change in wholesale prices.

. . . .

The decision as to what margin to use[,] when to change it, and consequently what retail price to charge remains [the retailer's] and we agree that such economic impact as follows from Sun's tight control of its own wholesale pricing is not a Sherman Act violation.

*Id.* at 437–38. The Ninth Circuit similarly has held that section 1 is not violated where only wholesale prices are fixed and the plaintiffs are not bound to sell to customers at prices specified by the defendant. *Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339 (9th Cir.1983), *cert. denied*, 464 U.S. 820, 104 S.Ct. 83, 78 L.Ed.2d 93, *see also American Telephone & Telegraph Co. v. Delta Communications Corp.*, 408 F.Supp. 1075 (S.D.Miss.1976), *aff'd*, 579 F.2d 972, *partially vacated and remanded on reh'g*, 590 F.2d 100 (5th Cir.1979); *Fa-*

*gan v. Sunbeam Lighting Co.*, 303 F.Supp. 356, 360–61 (S.D.Ill.1969).

Here, Rutledge controls the price of gasoline only by setting the price at which it is sold to the Taggarts. The fact that Taggarts' profit margin is not necessarily as high as it could be without the exclusive supply contract does not, in and of itself, give rise to an antitrust violation. *See General Cinema Corp.*, 681 F.2d at 597–98. Absent resale price maintenance, there can be no per se violation of section 1.

The same conclusion must be reached with respect to plaintiffs' horizontal conspiracy claims. There is no evidence of an "agreement among competitors" to set prices. In the absence of such evidence, plaintiffs cannot establish a per se violation of section 1. *49er Chevrolet*, 803 F.2d at 1467.

Having failed to find a per se violation, the Court must apply a "rule of reason" analysis. *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1189 (9th Cir.1984).[10] Under the rule of reason, plaintiffs must show that the Supply Agreement actually has injured competition. *O.S.C. Corp. v. Apple Computer*, 792 F.2d at 1469. The Court must "consider whether the intent of the restraint is anticompetitive and whether the restraint has significant anticompetitive effects." *Id.* This involves a balancing of the competitive evils of the restraint against its competitive benefits. *Gough v. Rossmoor*, 585 F.2d at 388.

Plaintiffs argue that the supply agreement works to the exclusive benefit of Rutledge and has no competitive benefits whatsoever.

However, the fact that no competitive benefits are advanced in favor of a restraint ... does not automatically constitute it unreasonable under the Sherman Act.... [I]t must first be established to be a restraint on competition and this involves a consideration of the impact of the restraint on the competitive conditions within the field of commerce in which the plaintiff [is] engaged and upon those commercially engaged in competition within it.

*Id.* at 389.

Relevant market definition is critical to a rule of reason analysis. The record reflects that plaintiffs' expert, Dr. Dennis O'Donnell, did not conduct an independent study to determine the relevant geographic and product markets in which plaintiffs compete. Based upon a publication of the Bureau of Business and Economic Research of the University of Montana, he defined the relevant geographic market as the three-county area surrounding Bozeman. Assuming this to be a correct assessment of the relevant market, the Court is unable to find a shred of probative evidence in the record tending to support a claim of competitive injury to the market.

Plaintiffs assert that they have been damaged by the restrictive provisions of the supply agreement and by Rutledge's pricing practices thereunder. The law is clear, however, that "[i]njury to an antitrust plaintiff is not enough to prove injury to competition." *O.S.C. Corp. v. Apple Computer*, 792 F.2d at 1469; *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car System, Inc.*, 732 F.2d 1403, 1408 (9th Cir.1984). Plaintiffs claim that the inability of other suppliers to sell gasoline to them does constitute an injury to competition. They offer no evidence to show that the supply agreement has any effect on competition between suppliers for the business of Bozeman retailers, or on competition between the retailers themselves. Defendants, on the other hand, have presented deposition testimony indicating that the market is very competitive and that prices vary accordingly. Plaintiffs challenge these statements but offer no evidence to refute them.

■ Absent proof of retail price maintenance or actual restraint of competition,

---

**10.** The "rule of reason" is also applied in analyzing restrictions imposed in the context of "dual distributorships." *Dimidowich v. Bell & Howell*, 803 F.2d at 1481. This concept refers to a situation where, as here, the defendant "operates at two distinct levels of the distribution chain in the same market by acting as both a supplier and a distributor of [the] product." *Id.* at 1480; *Krehl v. Baskin Robbins Ice Cream Co.*, 664 F.2d 1348, 1350–51 (9th Cir.1982).

plaintiffs' price-fixing claims must fail as a matter of law.

### E. Requirements Contract

Plaintiffs allege that the supply agreement constitutes an exclusive dealing arrangement which unreasonably restrains trade in violation of section 1 of the Sherman Act and of section 3 of the Clayton Act, 15 U.S.C. § 14.[11] The Clayton Act comes into play when the alleged "practical effect" of contract provisions is to prevent the use of goods of a competitor, thereby foreclosing competition in a substantial share of the line of commerce affected. L. Sullivan, Handbook of the Law of Antitrust § 151 at 433 (1977) (hereinafter cited as "Sullivan") (quoting *Standard Oil Co. v. United States*, 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371 (1949)).

Purchasing restrictions imposed upon buyers by sellers which may give rise to antitrust violations usually take one of three forms:

 1. Exclusive dealing arrangements, in which the seller agrees to sell on condition that the buyer agrees not to deal in competitive products;

 2. Requirements contracts, which are essentially exclusive dealing agreements with the added provision that the buyer agrees to purchase all or a substantial part of his needs of a particular product or service from the seller; and

 3. Tying arrangements.[12]

16A J. Von Kalinowski, Business Organizations § 6G.01[1] (hereinafter "Von Kalinowski").

■ The agreement between Rutledge and Taggarts represents a classic requirements contract, by which the Taggarts agree to purchase all of their needs of gasoline products from Rutledge unless Rutledge is unable to meet their demand. Generally, where a buyer is expressly or impliedly required to deal only with the seller for a specific product or service, an exclusive dealing agreement will be inferred, regardless of whether the buyer proposes the arrangement or is coerced into accepting it. Von Kalinowski, § 6G.02[1] at 6G–22. The only issue is whether this contract is unlawful under either section 1 of the Sherman Act or section 3 of the Clayton Act.

■ The Ninth Circuit recognizes that an exclusive dealing arrangement does not constitute a per se violation of the antitrust laws. *Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303–04 (9th Cir.), *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982) (*Finley II*) (relying on *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). Rather, a violation will be found only where the arrangement has the requisite anticompetitive effect upon a substantial share of the relevant market. *Id.* at 1304 n. 9.

■ Essentially the same tests are applied under section 1 and section 3. The primary distinction between the two sections lies in the types of transactions involved and in the degree of competitive injury required. *See* Von Kalinowski § 6G.03. Section 3 applies to a much narrower class of transactions or arrangements than those covered by the sweeping language of section 1. Sullivan § 151 at 432. The Clayton Act encompasses a broader range of injury, however, in that it proscribes all arrangements that "will probably lessen competition," whereas the Sherman Act applies only to actual restraints of trade. Von Kalinowski § 6G.03 at 6G–48. Thus, a greater showing of anticompetitive effect is required to establish a Sherman Act violation than to establish a section 3 Clayton Act violation in exclusive dealing cases. *Twin City Sportservice v. Charles O. Finley & Co.*, 512 F.2d 1264, 1275 (9th Cir.1975) (*Finley I*). See *Standard Oil Co. v. United States*, 337 U.S.

---

11. Section 3 of the Clayton Act makes it unlawful for any person, in the course of interstate or foreign commerce, to lease or sell any commodity, or to contract to do so, "on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the ... commodities of a competitor or competitors of the lessor or seller, where the effect ... may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.

12. Tying arrangements are defined and discussed *infra*, pp. 1445–48.

293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (6.7 percent market foreclosure held sufficient under section 3). The broad proscription of section 3 evinces "an intent to arrest in its incipiency conduct which eventually might develop into a violation of section 1 or 2 of [the] Sherman [Act]." Sullivan § 151 at 432.

The Supreme Court has ruled that a section 3 violation requires that competition be foreclosed in a "substantial share of the line of commerce affected." *Tampa Electric*, 365 U.S. at 327, 81 S.Ct. at 628. To create a workable application of this test, the Court identified three factors for consideration:

> *First*, the line of commerce, i.e., the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. [Footnote omitted.] *Second*, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.
>
> . . . .
>
> *Third*, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited.

*Id.* at 327–28, 81 S.Ct. at 628.

In this case, the line of commerce affected, i.e., the relevant product market, appears to be gasoline. No party has come forth with evidence to indicate otherwise. The area of effective competition, although apparently not "charted by careful selection of the market area in which the seller operates," is assumed to be the tri-county Gallatin area.[13] The only disputed issue is whether the supply agreement forecloses competition in a substantial share of that market.

■ Courts have taken language from *Tampa Electric* to evolve two tests under which substantiality is determined. *See*

*generally* Von Kalinowski § 6G.04[2]. The "quantitative substantiality" test looks only to the actual percentage of the relevant market which has been foreclosed to competition, and generally will be applied when a dominant seller uses exclusionary conditions as a general practice and the market share foreclosed is, in and of itself, substantial. The "qualitative substantiality" test, which requires consideration of a "broad range of economic factors," is used where the seller does not dominate the market and (a) the percentage of market foreclosure is not, in and of itself, substantial, or (b) the seller or buyer requires the challenged practices for the operation of his business. *Id.*

Rutledge is one of several "jobbers" who supplies gasoline in the Bozeman area. In response to Conoco's interrogatories, plaintiffs identified eleven jobbers as possible gasoline suppliers for Bozeman. Plaintiffs have not suggested that Rutledge is a dominant supplier who uses exclusive contracts as a general practice. On the contrary, the agreement between Rutledge and Taggarts is evidently the only requirements contract Rutledge has with any of the Conoco station operators in Bozeman. Additionally, the Court is unable to conclude from the record that the percentage of the relevant market foreclosed to competition by reason of this contract is, in and of itself, substantial. Therefore, the qualitative substantiality test seems more appropriate here to ascertain whether a substantial share of the market has in fact been foreclosed.

■ The qualitative substantiality test, as it has developed since *Tampa Electric*, suggests consideration of a number of factors:

> (1) the extent to which competition is foreclosed in the relevant market;
>
> (2) the dominance of the seller in his industry;
>
> (3) the relative strengths of the parties;
>
> (4) the ease with which new outlets can be developed;

---

**13.** The Court makes no finding as to whether this represents the appropriate geographic market, but merely draws this inference in plaintiffs' favor from the evidence submitted.

(5) the sales structure of the industry;

(6) the extent to which competition has flourished despite the use of the exclusive contracts; and

(7) the duration for which the arrangements are to run.

Von Kalinowski § 6G.04[2] at 6G–73 to –75 (citing *Tampa Electric*).

■ Given the evidence in the record presented by the parties, and considering it in light of the above factors, the Court concludes that plaintiffs have raised no issue of material fact by which a jury could find that the supply agreement has foreclosed competition in a substantial share of the relevant market. The factors weighing in plaintiffs' favor include the relative strengths of the parties[14] and the duration for which the arrangements are to run.[15] These two considerations in and of themselves, however, are insufficient to satisfy the qualitative substantiality test. As the Supreme Court stated in *Tampa Electric:*

> To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strengths of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

*Id.*, 365 U.S. at 329, 81 S.Ct. at 629.

Plaintiffs continue to emphasize the fact that, because of the exclusive supply agreement, other suppliers in the area are foreclosed from competing for plaintiffs' business, which constitutes a substantial dollar volume of gasoline each year. They conclude from this premise that the suppliers will be discouraged from entering the Bozeman market even to sell to other retailers. It is clear, however, that the dollar volume of the product involved is not the test of

substantiality. *Tampa Electric*, 365 U.S. at 334, 81 S.Ct. at 631. Moreover, there is no evidence that the overall gasoline market in the Bozeman area has been affected by the Taggart-Rutledge supply agreement. Plaintiffs offer no proof of their fears that suppliers are fleeing the Gallatin Valley because there is no market. The court can draw reasonable inferences in plaintiffs' favor, "[b]ut antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Electric Indus. Co.*, 106 S.Ct. at 1357.

There is no evidence of the proportionate volume of commerce involved in the subject contract in relation to the total volume of commerce in the relevant market area. There is no evidence that Rutledge is a dominant seller in the industry within the Gallatin area. There is no evidence that competition has not flourished despite the existence of the Taggart-Rutledge agreement. There is no evidence that new business is being foreclosed in the Bozeman market because of the defendants' actions in this case.

> Even though a single contract between single traders may fall within the initial broad proscription of [section 3], it must also suffer the qualifying disability, tendency to work a substantial—not remote—lessening of competition in the relevant competitive market.

*Tampa Electric*, 365 U.S. at 333, 81 S.Ct. at 631. Plaintiffs have offered no significant probative evidence in support of their claim that performance of the contract in question will foreclose competition in a substantial share of the line of commerce affected.

## F. Tying Arrangement

Plaintiffs allege that Rutledge illegally tied the sale of gasoline products to the sale of the Four Corners station in violation

---

14. Although defendants maintain that the supply agreement was a fully negotiated arms-length transaction desired by plaintiffs to guarantee a supply of gasoline, the Court assumes as true, for purposes of this ruling, plaintiffs' contention that they were compelled to execute the agreement or risk losing their station.

15. The potential 15–year term involved in the contract, although not inordinately long, carries a sufficient suggestion of restraint to resolve this factor in plaintiffs' favor.

of section 1 of the Sherman Act and of section 3 of the Clayton Act.

A tying arrangement exists "when a seller, having a product which the buyers want (the 'tying product') refuses to sell it alone and insists that any buyer who wants it must also purchase another product (the 'tied product')." Sullivan § 150 at 431. Upon establishment of the requisite elements, tying arrangements may be per se unlawful under section 1 of the Sherman Act, section 3 of the Clayton Act, or both.

■ There are three primary elements for proof of an illegal tying arrangement:

(1) a tie-in between two distinct products or services;

(2) sufficient economic power in the tying product market to impose significant restrictions in the tied product market; and

(3) an effect on a not insubstantial volume of commerce in the tied product market.

*Ariweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 (9th Cir.1984). Additionally, courts have imposed two "independent, but related" elements:

(1) the seller of the tying product must have an economic interest in the sale of the tied product; and

(2) there must be a showing of some extent of coercion.

*Id.* at 1189 n. 2. These elements are required under both section 1 and section 3. *Id.*

The "tying" product in this case is the Four Corners Conoco station, which plaintiffs clearly wanted to purchase and which was available only from Rutledge. The "tied" product is the gasoline, which plaintiffs assert they would not have purchased from Rutledge except to obtain the station.

Although the elements for proof of a tying violation are virtually the same under both section 1 and section 3, there are two significant differences between the two Acts. First, section 3 applies only if both the tying and tied items are "goods, wares, merchandise, machinery, supplies or other machinery." Therefore, it necessarily does not apply where the tying product involves real property. *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir.1977) (cemetery lots); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Second, the degree of proof required to show the requisite effect on commerce varies.

Under a § 3 theory, the plaintiff must establish that the effect of a tie-in "may be to substantially lessen competition." This standard is met either if the seller enjoys sufficient economic power in the tying product market to appreciably restrain competition in the tied product market or if a not insubstantial volume of commerce is restrained. The § 1 standard requires that both conditions be met.

*Moore*, 550 F.2d at 1214 (citations omitted).

■ Because the tying product in this case is essentially a land transaction, the arrangement must be analyzed under section 1. The preliminary elements are easily satisfied here. Construing the facts in plaintiffs' favor, a jury reasonably could find that the supply agreement for the sale of gasoline was tied to the sale of the station and that plaintiffs could not purchase the station without also purchasing the gasoline. Similarly, there is sufficient probative evidence to satisfy the element of coercion,[16] and there can be no question that Rutledge had an economic interest in the sale of the tied product, gasoline. The difficult elements are whether Rutledge enjoyed sufficient economic power in the tying product market to appreciably restrain competition in the tied product market and whether a "not insubstantial" volume of commerce has been restrained.

To establish the sufficient economic power requirement, plaintiffs are not required to prove a monopoly position or dominance in the market; generally, the test is whether the seller has sufficient power to raise prices or impose onerous terms that could not be exacted in a completely competitive

---

16. *See Moore,* 550 F.2d at 1217 (coercion occurs when the buyer must accept the tied item and forego possibly desirable substitutes).

market. *Moore*, 550 F.2d at 1215. "In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product." *Id.* (quoting *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 (1977) (*Fortner II*)).

Market power also may be shown by the uniqueness or desirability of the product. *Northern Pacific Ry. Co.*, 356 U.S. at 7–8, 78 S.Ct. at 519 (tying product unique piece of land); *United States v. Loew's, Inc.*, 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) ("absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes."); *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 569–70 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) (service station lease). In *Fortner II*, the Supreme Court clarified what constitutes appreciable economic power in the market for the tying product, and held that such power may be inferred from the uniqueness of the product "only when the seller has some cost advantage over its competitors or when its competitors, because of some barrier, cannot offer the same distinctive product as the seller even if they desired to do so." Von Kalinowski § 6G.05[2] at 6G–90. The Court identified three such barriers:

> legal, as in the case of patented and copyrighted products ..., or physical, as when the product is land, ... [or] economic, as when competitors are simply unable to produce the distinctive product profitably...."

*Fortner II*, 429 U.S. at 621, 97 S.Ct. at 868 (*quoting United States Steel Corp. v. Fortner Enterprises, Inc.*, 394 U.S. 495, 505 n. 2, 89 S.Ct. 1252, 1259 n. 2, 22 L.Ed.2d 495 (1969) (*Fortner I*)).

Here, the tying product being a service station located on a desirable piece of land in the heart of Montana's Gallatin Valley, it is reasonable to conclude that the product is sufficiently unique to permit an infer-

ence of the requisite economic power therefrom.

The remaining question is whether the arrangement affects a not insubstantial volume of commerce in the tied product market.[17] Unlike other measures of antitrust violations, the "not insubstantial volume" element does not require reference to the size or scope of any relevant market foreclosed by the tie.

> Rather, the controlling consideration is "whether a total amount of business, substantial enough in terms of dollar volume so as not to be merely *de minimis*, is foreclosed to competitors." ... The relevant figure is the total volume of sales tied and not the portion of sales allocable to the plaintiff.

*Moore*, 550 F.2d at 1216 (quoting *Fortner I*, 394 U.S. at 501, 89 S.Ct. at 1257). This dollar volume test has presented a troublesome model for courts to follow and naturally has been subject to a number of interpretations. *Fortner I* indicated that courts must look to the totality of the defendant's sales of the tied product sold by means of the challenged practice, including but not limited to the portion of such total accounted for by sales to the particular plaintiff who brings suit. *Id.*, 394 U.S. at 502, 89 S.Ct. at 1258.

The evidence in this case shows that plaintiffs purchase a substantial number of gallons of gasoline per year. The damage estimate originally calculated by plaintiffs' expert was based upon their purchase from Rutledge of 2,632,104 gallons of gasoline between October 12, 1978, and December 31, 1984. This would show an average purchase in the neighborhood of 440,000 gallons annually. A reasonable argument could be made that the dollar volume represented by plaintiffs' yearly requirements is "not insubstantial" within the meaning of the *Fortner I* test.

▮ Recently, the Supreme Court has further amplified the meaning of a "not insubstantial volume of commerce." Dis-

---

17. Because this arrangement is being tested under section 1 of the Sherman Act, the strict "in commerce" requirements of the Robinson-Patman Act discussed *supra* do not apply. For the purposes of this ruling, the Court takes as true plaintiffs' contention that the "affecting commerce" standard of section 1 is satisfied by the evidence presented herein.

cussing the per se illegality of tying arrangements, the Court held:

> application of the per se rule focuses on the probability of anticompetitive consequences. Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation. *If only a single purchaser were "forced" with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of the antitrust law.* It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.

*Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 16, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984) (emphasis added). It is clear from the quoted language that even though plaintiffs' purchase of gasoline may involve as much as a few hundred thousand dollars per year, because they are but a single purchaser, the tying arrangement as a matter of law cannot be held to be a per se violation of section 1.

### III. *Pendent Claims*

The Court having determined that plaintiffs have raised no issue of material fact by which a jury might conclude that they are entitled to judgment on their federal antitrust claims, and that defendants are entitled to judgment as a matter of law, the only remaining claims in the complaint are Counts II and III, each of which arises only under state law. The remaining claims being asserted against all defendants, there is no independent basis for jurisdiction based upon diversity of citizenship between the parties.

 Once a plaintiff's federal claims have been dismissed, exercise of pendent jurisdiction over purely state claims is within the court's discretion. *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1362 (9th Cir.1985) (en banc). The Supreme Court has indicated a preference for dismissal of remaining state claims on the ground that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of state law." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Under Montana law, parties have one year from the date of dismissal of a federal action for want of jurisdiction within which to bring suit in state court. *See* Mont. Code Ann. § 27–2–407 (1985); *Cassidy v. Finley,* 173 Mont. 475, 568 P.2d 142, 144 (1977). *See also McCracken v. City of Chinook, et al.,* 652 F.Supp. 1300 (D.Mont. 1987). Thus, plaintiffs will not be prejudiced by dismissal of the state claims.

### ORDER

Based upon the foregoing opinion,

IT IS HEREBY ORDERED:

1. Plaintiffs' motion for summary judgment is DENIED.

2. The motion for summary judgment on behalf of defendants David S. Rutledge, Janette G. Rutledge, and David Rutledge Distributing Company, Inc., as to Counts IV and V of the amended complaint is GRANTED on the ground that such claims are barred by the doctrine of claim preclusion.

3. The motions of all defendants for summary judgment as to Count I of the amended complaint (all federal antitrust claims) are GRANTED.

4. Counts II and III of the amended complaint are DISMISSED without prejudice for want of jurisdiction.

Judgment shall enter accordingly, all parties to bear their own costs.